**Rex HOPKINS and Jo Strader,
Appellants (Cross–
Respondents),**

v.

**AMERICAN ECONOMY INSURANCE
CO., Respondent (Cross–
Appellant).**

No. WD 47651.

Missouri Court of Appeals,
Western District.

Feb. 21, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 28, 1995.

Application to Transfer Denied
May 30, 1995.

---

James A. Burt, Springfield, for appellant.

Gordon N. Myerson, Kansas City, for respondent.

Before ULRICH, P.J., and LOWENSTEIN and HANNA, JJ.

LOWENSTEIN, Judge.

Both sides have appealed the judgment rendered after a jury verdict in this suit, which was brought by an insured against his carrier, American, to stack or combine underinsured motorist benefits without offset for the recovery against the tortfeasor, as well as damages for vexatious refusal to pay.

■ Underinsured coverage is optional from a person's own motorist carrier and pays for losses incurred because another negligent motorist's coverage is insufficient to pay for the injured person's actual losses. *Geneser v. State Farm Mut. Auto. Ins. Co.*, 787 S.W.2d 288, 289 (Mo.App.1989). Under the policy here, an "underinsured vehicle" means a vehicle to which an insurance policy "... applies at the time of the accident, but its limit for bodily injury liability is less than the limit of liability for this coverage." This policy language is practically the same as in a policy involving the insurer in *Nolan v. American State Preferred Ins. Co.*, 851 S.W.2d 720, 722 (Mo.App.1993).

The plaintiffs are Rex Hopkins, the insured, and his daughter, Jo Strader. For ease of discussion, these plaintiffs will be referred to collectively as Hopkins. Rex Hopkins was driving, and his wife, Helene, was the passenger when they were involved in a collision. Their automobile was one of three which Hopkins insured with the defendant, American Economy Insurance Co. (American). Helene Hopkins was killed in the collision, and Rex Hopkins was injured. The other automobile, insured by Allstate, was driven by a young lady named Romans. Hopkins and his daughter recovered $50,000, the policy limits, from Romans' carrier, Allstate, on the wrongful death claim of Helene Hopkins. In addition, Hopkins received $25,000 in settlement from Romans' carrier for his personal injury claim. The accident occurred near Bolivar on Highway 13. Evidence indicated that Romans' car ran a stop sign.

Hopkins' petition stressed that his policy with American had $100,000 and $300,000 limits, and covered three vehicles, all of which contained underinsured coverage. The petition also alleged Romans' coverage was less than the limits of American's policy. Hopkins claims to have made demands for the combined underinsured policy limits ($300,000), but American had denied that stacking was allowed, and had further claimed it was allowed a deduction from the policy limits for the amounts Hopkins had received in settlement from Allstate. It was American's failure to allow stacking and insisting on the deduction for an offset, that provided the foundation for the additional count in the petition for vexatious refusal to pay. Section 375.296, RSMO 1986 [1]. This statute allows, in addition to allowing an insured the ability to enforce the contract of insurance, to also seek additional damages. Under § 375.420 RSMo 1986 [2].

1. **375.296. Additional damages for vexatious refusal to pay**

In any action, suit or other proceeding instituted against any insurance company, association or other insurer upon any contract of insurance issued or delivered in this state to a resident of this state, or to a corporation incorporated in or authorized to do business in this state, *if* the *insurer* has *failed* or refused for a period of thirty days *after due demand* therefor prior to the institution of the action, suit or proceeding, to *make payment under* and in accordance with the *terms* and provisions *of the contract* of insurance, *and* it shall appear from the evidence that the *refusal was vexatious and without reasonable cause*, the court or jury may, in addition to the amount due under the provisions of the contract of insurance and interest thereon, allow the plaintiff damages for vexatious refusal to pay and attorney's fees as provided in section 375.420. Failure of an insurer to appear and defend any action, suit or other proceeding shall be deemed prima facie evidence that its failure to make payment was vexatious without reasonable cause. (Emphasis added).

2. **375.420. Vexatious refusal, to pay claim damages for, exception**

In any action against any insurance company to recover the amount of any loss under a policy of automobile, fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance except automobile liability insurance, if it appears from the evidence that

Hopkins submitted three counts against American: the first for recovery of the underinsured motorist's benefits under the policy for the wrongful death of Helene for which the jury returned a $500,000 verdict; the second was also for recovery of underinsured benefits under the American policy for Hopkins' personal injuries which resulted in a verdict for $260,000 with all the fault assessed against the defendant; and, the third count was for American's refusal to pay without reasonable cause or excuse (vexatious refusal to pay on the underinsured provision of Hopkins' policy) which ended with a total verdict of $534,050, including $153,900 for interest, $76,150 for penalty, $304,000 for attorney's fees, and nothing for expenses.

The court, believing Hopkins failed to make a submissible case for vexatious refusal to pay, granted American's motion for Judgment N.O.V. on count three. This ruling forms the first point raised in Hopkins' appeal. The trial court also entered an order granting American a $50,000 offset (based on the settlement from Allstate) of the $300,000 judgment under count one for wrongful death (the verdict was for $500,000, but the judgment was limited by $300,000, the amount of the "stacked" coverage). That ruling forms the other point of Hopkins' appeal. The trial court then reduced the verdict on count two for Hopkins' personal injury verdict, $260,000, by the $25,000 he received from Allstate for a judgment of $235,-000. *This ruling has not been appealed.* American's cross-appeal stems from various allegations of error on the admission of evidence (testimony for the plaintiffs by two former Supreme Court Justices), rulings on plaintiffs' argument, instructional and other errors. American's other point attacks the judge's conclusion allowing stacking of the three $100,000 limit policies to form a gross aggregate limit of recovery of $300,000 on the wrongful death and personal injury counts. Additional facts on each side's appeal will be provided in the pertinent discussion location.

The total of four points contained in both appeals will be taken up in the following order: 1) Hopkins' point of error in allowing an offset against policy limits on the wrongful death case; 2) American's point that the court erred in determining underinsured motorists coverage stacks; 3) Hopkins' contention of trial court error in granting American's Judgment N.O.V.; and 4) because of the disposition of all the other issues, American's remaining point dealing with various trial errors will not be taken up. Additional facts relevant to each point will be provided in the discussion pertinent to that point.

## I. OFFSET

The relevant part of the policy on offset, located in the "Limit of Liability" section provides:

> "*Any amounts* otherwise *payable* for *damages under this coverage* shall be reduced by:
>
> 1) All *sums paid* because of the bodily injury *by* or on behalf of persons or *organizations* who may be legally *responsible.*"

Hopkins asserts the above provision, when read against the backdrop of the following language from within the policy, creates an ambiguity:

> "*We will pay damages* which a covered person is legally entitled to recover from the owner or operator of an uninsured/underinsured motor vehicle because of bodily injury sustained by a covered person and caused by an accident",

and, from the Limit of Liability Section:

> "If the *limit of liability* in the Declarations is *shown* separately for 'each person' and 'each accident'; The limit of liability for 'each person' for Uninsured/Underinsured Motorists Coverage *is our maximum limit of liability for all damages* for bodily injury sustained by any one person in any one auto accident. This is the most we will pay regardless of the number of

such company has refused to pay such loss without reasonable cause or excuse, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff *damages* not to exceed twenty percent of the first fifteen hundred dollars

of the loss, and ten percent of the amount of the loss in excess of fifteen hundred dollars *and a reasonable attorney's fee;* and the court shall enter judgment for the aggregate sum found in the verdict. (Emphasis added)

covered persons, claims made, or vehicles involved in the auto accident."

In a nutshell, Hopkins argues the policy language is ambiguous in deciding this crucial issue: Is the $50,000 received from the underinsured's carrier for the wrongful death count for Mrs. Hopkins, **subtracted** from the **damage incurred** to Hopkins, or is that amount **offset** from the combined *coverage* of the American policy? With verdict damages for Helene Hopkins' death set at $500,000, and combined policy limits of $300,000, the difference in the net effect of which interpretation of American's ruling is adopted is now shown:

**Hopkins interpretation:**

$500,000 (damages) − $50,000 (settlement) = $450,000 in damages, Which is covered to the extent of $300,000, the stacked coverage of the three policies.

**Trial court's interpretation and ruling:**

$300,000 (stacked underinsured coverage) − $50,000 = $250,000 recoverable on the American combined limits of $300,000.

The ruling to offset the recovery against underinsured coverage limits is supported by the opinion of the Court adopted in *Rodriguez v. General Accident Insurance Co. of America*, 808 S.W.2d 379 (Mo banc 1991). The insured in *Rodriguez* had coverage of $50,000 for each of two vehicles. The tortfeasor's insurer paid the limits of a $50,000 policy. 808 S.W.2d at 380. The plaintiffs' policy with the defendant, in language the same as the case at bar, defined an underinsured vehicle as one with liability insurance with a "... limit ... less than the limit of liability for this coverage." *Id.* at 381. The *Rodriguez* policy language limiting liability as to offset, was almost the same as in the present case; "however, the limit of liability shall be reduced by all sums paid because of the 'bodily injury' or, on behalf of, persons ... who may be legally responsible." (Though it applies to the next point on appeal as to stacking, the *Rodriguez* language under the limits of liability stated: "The limit of liability shown in the schedule ... is our maximum limit.... This is the most we will pay, regardless of the number of ... vehicles or premiums shown in the Declarations...."

*Id.* The stacking language there is not the same as in American's policy, as will be pointed out in II *infra.* The court ruled the language prohibited stacking, and denied the tortfeasor's vehicle was "underinsured." *Id.* at 382 and 383.

The appellants in *Rodriguez* argued the offset language in their policy created excess coverage. The Court held that policy language reducing the limit of liability for all amounts "paid ... on behalf of persons ... legally responsible," had "T[t]he effect of ..." a "set-off of the $50,000 paid by [the tortfeasor's insurer] against the $50,000 coverage provided by the respondent." *Id.* at 382.

■ With no basic difference between the policy in *Rodriguez* and the one here, this court deems the trial court was correct in applying Allstate's proceeds against policy limits, not damage suffered. *American Economy Insurance Co. v. Cornejo*, 866 S.W.2d 174, 178 (Mo.App.1993). By contrast, the clear policy language in *American Family Mutual Insurance Co. v. Turner*, 824 S.W.2d 19, 21–22 (Mo.App.1991), differed from *Rodriguez*, and from the policy in this case. In *Turner*, the underinsured policy was broader than here, and specifically granted underinsured benefits when the other driver's insurance "provides limits less than the damages an insured person is legally entitled to recover." *Id.* at 21. American's language in Hopkins' policy is not ambiguous and does not refer to "total damages" but, rather, refers to "amounts payable [as damages] under this coverage shall be reduced by...." *Nolan*, 851 S.W.2d 720, at 722; *Keating v. Gavrilovici*, 861 S.W.2d 205, 208 (Mo.App.1993).

The ruling here is in contrast to policy language in *Krombach v. Mayflower Ins. Co., Ltd.*, 827 S.W.2d 208 (Mo. banc 1992); *Killpack v. Farm Bureau Town & Country Ins. Co.*, 861 S.W.2d 608 (Mo.App.1993); cases cited by Hopkins where policy language was ambiguous, and could be interpreted as allowing the settlement amount to be taken against damages suffered on the coverage.

## II. STACKING

█ American's point of error concerns the trial court's determination that the coverage on the three automobiles insured by Hopkins, could be combined or stacked, to make a total coverage of $300,000 on the wrongful death action. To ease discussion, information pertinent to underinsured and uninsured coverage is as follows: Missouri motorist policies must have **uninsured** coverage which must be paid for by the public, and public policy prohibits insurers from adding policy language prohibiting stacking of uninsured policies. On the other hand, Missouri does not require **underinsured** coverage, but it can be requested by the consumer. There is no public policy mandating stacking of underinsured policies. If the policy language is unambiguous in disallowing stacking, there can be no court interpretation mandating stacking for this optional coverage. If the policy language is ambiguous, or treats underinsured the same as uninsured, courts should construe the policy in favor of the insured and for stacking.

█ The following language from *Rodriguez,* 808 S.W.2d 379, is apropos here:

"There are no statutory requirements in Missouri for underinsured motorist coverage. Therefore, the existence of the coverage and its ability to be stacked are determined by the contract entered between the insured and the insurer."

*See also Geneser,* 787 S.W.2d at 290. In the absence of public policy mandating underinsured (as opposed to uninsured) coverage, and if the anti-stacking policy language is clear and unambiguous, the courts won't create the extra coverage. *Id.* at 383–84. In *Rodriguez,* the policy stated the "... limit of liability ... in the schedule for this coverage is the maximum for all damages ... from any one accident. This is the most we will pay regardless of the number of ... [v]ehicles or premiums shown in the Declarations." (Last ellipses in original). The stacking language in the American policy differs from the language in *Rodriguez.*[3]

█ The language from the policy in the case at bar is similar to that in *Krombach,* where the Supreme Court, noting this court's opinions in *Maxon v. Farmers Insurance Co.,* 791 S.W.2d 437, 438–39 (Mo.App.1990) and *Tegtmeyer v. Snellen,* 791 S.W.2d 737 (Mo.App.1990), said when underinsured coverage is lumped into the same provisions of the policy as the mandated uninsured coverage, the public policy that invalidates the anti-stacking provisions of uninsured "is equally applicable to underinsured motorist coverage if the two are treated as the same in the insurance contract." The policy in *Krombach* treated both provisions the same. The Court, applying traditional rules of construction of insurance contracts; i.e., construing ambiguities against the insurer and drafter so as to increase coverage rather than decrease coverage, *Id.* 210–11, allowed stacking. A similar result was reached in *Nolan,* at 724 (by identifying underinsured limits and referencing them to the uninsured coverage, the insurer treated both as the same—lumping apples and oranges together, and calling them both apples); *American Economy,* 866 S.W.2d 174 at 177; *Keating,* at 207, where an American policy with the same language as here was at issue, the Eastern District found an ambiguity, and approved stacking of underinsured coverage.

Accordingly, the trial court's ruling on the stacking issue was correct, and American's point is denied.

## III. HOPKINS' APPEAL OF JUDGMENT N.O.V. ON VEXATIOUS REFUSAL

The granting of a motion for N.O.V. is akin to directing a verdict at the close of the evidence. *Midwest Materials Co. v. Village Dev. Co.,* 806 S.W.2d 477, 489 (Mo.App.1991). Review is as a matter of law, *Rhodes v. Marsh,* 807 S.W.2d 222 (Mo.App.1991), to determine whether the plaintiff made a sub-

---

3. The limit of liability for "each person" for **Uninsured/Underinsured Motorists Coverage** is our maximum limit of liability for all damages for bodily injury sustained by any one person in any one accident. Subject to this limit for "each person," the limit of liability for "each accident" for **Uninsured/Underinsured Motorists Coverage** is our maximum limit of liability for all damages for bodily injury resulting from any one auto accident. This is the most we will pay regardless of the number of **covered persons,** claims made, or vehicles involved in the auto accident....

missible case, and this court must view the evidence and inferences in a light most favorable to the verdict. *Wion v. Carl I. Brown & Co.*, 808 S.W.2d 950, 953 (Mo.App.1991).

Under the applicable verdict director, M.A.I. 10.08, if the jury finds for the plaintiff on the policy, and if it believes the company "refused to pay without reasonable cause or excuse," then the penalties mentioned earlier in § 373.296 can be awarded.

Before recounting all the evidence, including the extensive and acrimonious negotiations between Hopkins' counsel and American prior to the filing of this case for vexatious refusal, several principles must be kept in mind: 1) "... whether a refusal to pay is vexatious or not must be determined by the situation as presented to the insurer at the time it was called on to pay." *Russell v. Farmers & Merchants Ins. Co.*, 834 S.W.2d 209, 221 (Mo.App.1992); 2) The statute, § 375.420, is penal in nature, and is to be strictly construed. *Duckworth v. United States Fidelity and Guaranty Co.*, 452 S.W.2d 280, 287 (Mo.App.1970); *Hay v. Utica Mutual Ins. Co.*, 551 S.W.2d 954, 958 (Mo.App.1977); 3) the plaintiff must show the insurer's refusal to pay ... "was willful and without reasonable cause or excuse, as the facts would have appeared to a reasonable person before trial." *Groves v. State Farm Mutual Auto Ins. Co.*, 540 S.W.2d 39, 42 (Mo. banc 1976); *Hopkins v. North American Co.*, 594 S.W.2d 310, 318 (Mo.App.1980); *Patterson v. American Ins. Co.*, 174 Mo.App. 37, 160 S.W. 59, 62 (1913);[4] 4) where there is an open question of law or fact, the insurer may insist on a determination without "being penalized." *Oliver v. Cameron Mut. Ins. Co.*, 866 S.W.2d 865, 870 (Mo.App.1993); 5) However, despite 4) above, "The existence of a litigable issue, factual or legal, does not preclude a vexatious penalty where there is evidence the insurer's attitude was vexatious and recalcitrant." *DeWitt v. American Family Mut. Ins. Co.*, 667 S.W.2d 700, 710 (Mo. banc 1984); 6) Direct evidence is not necessary. The jury may find vexatious de-

lay, "upon a general survey," and on consideration of all the testimony and circumstances of the case. *Id.* at 710; 7) "... the mere fact that a judgment determines insurance coverage adverse to the position taken by the insurer, is not sufficient in itself to award damages for vexatious delay." *Boatmen's First Nat'l Bank v. Hawkeye–Sec. Ins. Co.*, 861 S.W.2d 600, 603 (Mo.App.1993); 8) An insurance company becomes liable when it persists in its refusal to pay after it becomes aware it has no meritorious defense. *Kay v. Metropolitan Life Ins. Co.*, 548 S.W.2d 629, 632 (Mo.App.1977).

Evidence and inferences favorable to the submission for vexatious delay are as follows: The accident occurred on July 5, 1988. Romans was negligent in causing the wreck. American's adjustor, Creed, contacted Hopkins shortly after the accident and the company began making payments on the medical and collision part of the policy (soon reaching a settlement on property damage and paying the limits on medical), but did not advise Hopkins, contrary to company policy, of his underinsured coverage. Between their July 1988 notice, and February 1989, American made no effort to settle the death claim for underinsured benefits. In February 1989, Hopkins retained the Strong law firm in Springfield for advice on the policy's underinsured benefits. In March 1989, American, replying to the Strong firm's letter, advised it would ask the firm to disqualify itself since the firm had, within the previous two to three years, defended American. A flurry of letters followed over the next several months, in which the Strong firm advised that Harold Barrick, of the Bar Ethics Committee, had stated there was no problem in their representation of Hopkins. Strong stated American's stance created an atmosphere "not conducive to settlement negotiations." A final letter from the Strong firm chastised American for unsuccessfully attempting to disqualify that firm in another civil suit involving American. Settlement of the underinsured

---

4. Earlier cases held the latest for operable facts showing the company's vexatious refusal had to come before the *filing of suit*, not up to trial. See e.g. *Butler v. Equitable Life Assur. Soc.*, 233 Mo.App. 94, 93 S.W.2d 1019, 1026 (Mo.App. 1936); *Howard v. Aetna Life Ins. Co.*, 350 Mo. 17, 164 S.W.2d 360 (Mo.1942); *O'Brien v. Equitable Life*, 14 F.R.D. 141 (D.C.Mo.1953); *Hunt v. U.S. Fire Insurance Co. of New York*, 239 Mo.App. 625, 193 S.W.2d 778 (1946).

claim was not discussed. Suit was filed in July 1989, against Bevins and American.

Hopkins, with court approval, settled with Bevins for $50,000 on the death claim, leaving for trial Hopkins' suit for underinsured benefits and for vexatious penalty. In its answer and early subsequent responses, American, in its answer of general denial, denied Helene Hopkins death and that she was both the wife and mother of the two plaintiffs. American later admitted those points. American never followed through on its statement of intent to disqualify Hopkins' counsel.

Just prior to, and during this trial, American tried to prove a percentage of fault for the crash against Mr. Hopkins. American's attempts to show he was going too fast or that he was inattentive, were unsuccessful as the jury apportioned no fault to Hopkins' driving.

American steadfastly denied stacking was allowed. As stated earlier, Hopkins presented two retired Justices of the Supreme Court who said there was $300,000 of coverage, not $100,000. Despite the contrary opinion of a retired Jackson County circuit judge, the court's ruling agreed with Hopkins. All of American's offers of settlement were based on its belief stacking was not allowed and it would be entitled to an offset for Hopkins' recovery from Allstate on the wrongful death action. The chronology of those pre-trial offers are set out below, as well as other pertinent events through trial.[5]

The former chairman of the Bar Advisory Committee on Ethics testified that American had no basis to threaten to disqualify, as was borne out by a judge's entering sanctions against American in another suit where American did, in fact, attempt to disqualify the Strong firm.

Before examining the merits of the trial court's ruling, Hopkins' first alleges American's motion for directed verdict was insufficient to have entertained a subsequent motion for judgment N.O.V. Rule 72.01(b) allows a party to move for a directed verdict at the close of all evidence, and on denial, the court is deemed to have submitted the case subject to later determination (via judgment n.o.v.) of the legal questions raised by the motion. Hopkins relies on language from *Dierker Assocs, D.C., P.C. v. Gillis*, 859 S.W.2d 737, 743 (Mo.App.1993) and *Kincaid Enterprises, v. Porter*, 812 S.W.2d 892, 894–95 (Mo.App.1991), to the effect that a directed verdict motion that does not conform to the Rule presents no basis for later relief in the trial court, nor at trial or on appeal on submissibility. Those two cited cases concern the effect of non-specific grounds in the directed verdict motion not being available to bolster a later, more specific set of reasons in a motion for judgment N.O.V.

American's motion for directed verdict stated: "Plaintiffs' evidence failed to establish that defendant's conduct was vexatious, and failed to establish that plaintiffs were damaged by any such conduct, as a matter of law." American cites the court to cases for the holding that a trial court may direct a verdict on its own, and a motion for directed verdict is not a prerequisite for the granting of a judgment N.O.V. *Rustici v. Weidemeyer*, 673 S.W.2d 762, 767 (Mo. banc 1984); *Vinson v. Vinson*, 725 S.W.2d 121, 123 (Mo. App.1987); and *Rhodes v. Marsh*, 807 S.W.2d at 223.

---

5.          **CHRONOLOGY OF EVENTS**

**(American's offers in bold)**

5/88   Accident
8/88   Collision and medical pay settled
2/89   Hopkins hires Strong as Attorney
3/14/89 American asks Strong to disqualify
7/13/89 Petition filed against tortfeasor and American (for stacked policy lines)
2/26/90 **offered $50,000 on death claim.**
3/20/90 **re-offered $50,000 on death claim.**
10/90 *Hopkins' suit with Allstate settled*
11/26/90 Hopkins demands $300,000 on wrongful death claim
12/21/90 **re-offered $50,000 on death claim.**

01/18/91 **offered $100,000 on death claim.**
5/3/91 *Rodriguez* handed down
8/8/91 Trial court rules set-off in favor of American
10/10/91 **offered $150,000 on death claim.**
11/27/91 **offered $150,000 on death claim.**
07/31/92 **offered $350,000 (combined offer on death claim and personal injury claim.)**
08/31/92 **Offer of Judgment filed—$250,000 on death claim.**
11/30/92 **$525,000 combined offer.** Trial begins and goes through Dec. 16.
3/26/93 Trial court rules stacking issue in favor of Hopkins and enters judgment N.O.V.

The court simply rules the trial judge had the power to rule upon the N.O.V. motion and that this court can, and will, examine that ruling.

■ The court now tackles the issue of whether plaintiffs made a submissible case under § 375.296. Before addressing a sample of cases where courts of this state have ruled both ways, a few additional observations are in order: 1) The very character of a vexatious refusal to pay case makes it hard to define what factual mix must be present to make a jury issue. Each case literally must be decided on its own merits. *Irelan v. Standard Mut. Asso.*, 379 S.W.2d 815, 821 (Mo.App.1964); 2) The very purpose of this statutory action is to provide relief to someone who, in the vernacular, has been "horsed around" by his or her insurance carrier, after the insured has requested payment under the contract of insurance. It is to provide relief to the insured for having to go through the trouble of legally securing the amounts the contract called for. The procuring of interest on the unpaid coverage did not adequately compensate a plaintiff, so the legislature "saw fit to discourage such conduct by adding attorney's fees and a penalty where 'the company has vexatiously refused to pay the loss.'" By the same token, the statute was not intended to prevent a company from resisting payment where the question of law or fact about the claim was doubtful, *Weston v. American Ins. Co.*, 191 Mo.App. 282, 177 S.W. 792, 794 (1915); *Non–Royalty Shoe Co. v. Phoenix Assur. Co.*, 277 Mo. 399, 210 S.W. 37, 43 (1918); 3) What truly makes this statute, penal in nature, so unusual, as to the company, is that even though up to the time of the trial, the company may have had valid questions on the law or facts, and that the company may ultimately win on some or all of those issues it may, nonetheless, be susceptible to the statutory penalty for unfairly treating its contractual insured. To this extent, the vexatious refusal statute is somewhat similar to the doctrine of prima facie tort, where an intentional lawful act by the insurance company, and done without justification and with intent to injure, does cause injury to the insured. Cf. *Porter v. Crawford & Co.*, 611 S.W.2d 265, 268 (Mo.App.1980).

To put all this legalese into some perspective, the court will now examine cases in which a submissible claim was held to have been made; and then cases where the evidence was insufficient to send the case to the jury. Some of the cases referred to will of necessity, involve factual issues surrounding the loss or claim; i.e., the insured staging a loss, as opposed to the case at bar, where there is no such question about the claim itself, only the conduct of the insurer.

## CASES WHERE FACTS MADE A SUBMISSIBLE ISSUE OF VEXATIOUS REFUSAL

One submissible case was where the "investigation took more than the allowed time," for the theft of a truck. Numerous letters from different persons at the insurer of the truck but none would give the insured any answer. Mistakes made by insurance company in identifying the property. *Laster v. State Farm Fire and Casualty Co.*, 693 S.W.2d 195, 197 (Mo.App.1985).

In an uninsured case where husband and wife were insured, the company, on three occasions, attempted to force the wife to relinquish her claim "by refusing payment of [husband's] clearly warranted claim," and as such, "evidenced an attitude of recalcitrance and vexatiousness ..." *Oliver*, 866 S.W.2d 865 at 870.

On a "hospital expense policy" where plaintiff severely fractured and splintered both bones in her forearm, and was taken to the hospital and had total submitted expenses of $62.50, the company made several attempts to settle for the $5 ambulance charge. Contrary to clear policy language, the insurer asserted this was only an outpatient procedure with no disability. The company presented no evidence, and had a verdict directed against it on the underlying claim. It was ruled the matter of vexatious refusal was properly submitted when the "defendant took an arbitrary position" on coverage, and "may not willfully obstruct the rights of the insured, fret and harass him without rational cause, without escaping the penalty...." *McCarty v. United Ins. Co.*, 259 S.W.2d 91, 94 (Mo.App.1953).

In *Groves v. Great Eastern Casualty Co.,* 212 Mo.App. 316, 246 S.W. 1002 (1923), the plaintiff was thrown from a car and suffered a fracture and amputation of his left foot. The company refused to pay on an accident policy, first claiming the insured lost the foot by disease, and then, that the insured was not seated in the proper place in the car. The opinion stated "There was no evidence of any effort to settle the claim in the long period that defendant had to investigate it." *Id.* 246 S.W. at 1005.

The insurance company in *Hunt v. United States Fire Ins. Co. of New York,* 239 Mo. App. 625, 193 S.W.2d 778 (1941), filed a declaratory judgment before the insured could file his suit on the insurance contract, and "began a long course of obstructive maneuvers," and "resorted to numerous legal actions, all of which proved to be without merit . . . the effect of which was to delay the trial of plaintiff's case for about three years. . . ."

In noting vexatious damages are not to be allowed if the insurer has reasonable cause to believe there is no liability under the policy, the Southern District in *Travelers Indemnity Company v. Woods,* 663 S.W.2d 392 (Mo. App.1983), held a submissible case was made where the company refused to pay on a home fire, based only on a "suspicion" the insured caused the loss, and its expert proved to not be believable by the jury.

In *DeWitt,* 667 S.W.2d at 710, the court held the company's action was without reasonable cause and its attitude recalcitrant when, under a fire policy on a home, it failed for a considerable time after notice to pay on the mortgages "due to a mistake." Additionally, the company failed to return premiums (on the defense of lack of insurable interest), failed to adequately investigate the claim, and did not offer a reasonable explanation for refusing to pay. Likewise, in *Still v. Travelers Indemnity Co.,* 374 S.W.2d 95, 103 (Mo. 1963), where the company chose to litigate the plaintiffs' insurable interest in property being transferred, the court looked to the failure to return premiums, its failure to give reasons for refusing to pay, and certain admissions in interrogatory answers that showed knowledge the company asserted it did not have, and allowed a vexatious claim

showing an attitude of recalcitrance even though the insurer sought to litigate an open question of law.

An open question of law, as to whether a surety was subject to the imposition of penalties under § 375.420, did not save the company in *Housing Authority of Clinton v. Baumann,* 512 S.W.2d 436 (Mo.App.1974). The only action the company took on a claim under a construction contract, was a letter that it had " 'washed its hands' of the whole matter and turned it over" to another person it felt was jointly and severally liable. This court said the record disclosed the company did not investigate the matter, examine the merits of the claim, make an effort to negotiate a settlement, nor " . . . assert any legal or factual position or defense which would indicate good faith or lack of willful refusal to meet its obligations."

*Malo v. Niagara Fire Ins.,* 282 S.W. 78 (Mo.App.1926), involved a fire policy on household goods. The insured moved to another spot in the same city, and had a loss. The company claimed a forfeiture, primarily because of the move, and for several other reasons based on its interpretation of the policy. As in the case at bar, the company's answer consisted of a general denial. In holding a submissible case was made, the court, at page 80, listed these factors: a) all the defenses failed; b) the plain policy language was against the company; c) there was nothing in the policy which would cause a forfeiture; and d) the company was estopped to declare a forfeiture since it did not timely tender the unearned premium.

The policy in *National Battery Co. v. Standard Acc. Ins. Co.,* 226 Mo.App. 351, 41 S.W.2d 599 (1931) covered an employer's liability policy on which two claims were made against the insured. Contrary to the company's assertion, it had no evidence of untimely notice. The adjuster delayed investigation, and at trial, the company "made no showing whatever that it had any reasonable ground on which to disclaim liability," and then switched defenses prior to trial.

Contrary to policy language on life insurance, the company sought to require an insured to take a later medical exam or lose

coverage, prompting the court in *Cox v. Kansas City Life Ins. Co.*, 154 Mo.App. 464, 135 S.W. 1013 (1911), to hold, "plaintiff's right to recover is undisputable, and she ought not to have been subjected to the expense and vexation of a lawsuit in order to recover the insurance money."

In *Wollums v. Mutual Ben. Health & Accident Ass'n.*, 226 Mo.App. 647, 46 S.W.2d 259 (1931), claim was made on an accident policy where the insured had suffered serious injuries when struck by lightening. The company delayed by requesting numerous forms and information, then declared it needed additional medical information, and finally wanted the bedridden claimant to be examined by an the company doctor in Omaha. After a delay in investigation, the company sought to void the policy and assert the demand was excessive. Further, after more than a year of negotiations (where the plaintiff's creditworthiness was questioned), the company had still never arrived at a conclusion whether or not it would pay the claim.

A case was made in *Allen v. State Farm Mutual Automobile Ins. Co.*, 753 S.W.2d 616, 621 (Mo.App.1988), where the company was dubious about the theft of the claimed vehicle. It made an initial investigation with police, and then made no further effort to investigate, so that it did not have substantial facts on which to base suspicions.

A lack of investigation was important in *Russell v. Farmers*, 834 S.W.2d at 209, where the property loss was suffered by recently divorced persons. The company paid on the ex-husband's claim but refused to pay on the ex-wife's without giving any reason for the disparate treatment. The ex-wife made repeated demands and the company responded for some two and one half years with its initial belief the loss had been faked. Each time when called on to pay, the company persisted in a requirement she supply additional information. *Id.* at 222–23.

### FACTS INSUFFICIENT FOR VEXATIOUS REFUSAL SUBMISSION

An open question of law as to the insurer's liability under a binder as opposed to under the policy was litigated in *Hay*, 551 S.W.2d at 958. The court held that even though the insured prevailed on the underlying policy question, under the particular circumstances the petition did not present a certain path leading to victory, and the insurer was not liable for statutory damages when it litigated the honest differences of opinion, in good faith. Similarly, in *King v. New Empire Ins. Co.*, 364 S.W.2d 40, 42 and 47 (Mo.App.1962), the trial court was affirmed when it refused to submit on the issue of vexatious refusal, where there was a honest difference of opinion as to whether death was accidental, even though that issue was resolved in favor of the insured. The penalty was not inflicted in *Kay v. Metropolitan Life Ins. Co.*, 548 S.W.2d at 632, where there was an ambiguity under the policy, and the court explained it is only when the insurer persists in its refusal after becoming aware it has no meritorious defense that it becomes liable. See also *Boatmen's*, 861 S.W.2d at 603; *United States Fidelity and Guaranty Co. v. Empire State Bank*, 448 F.2d 360, 368 (8th Cir.1971), where issue of liability "to be an extremely close one"; *Non-Royalty Shoe*, 210 S.W. at 42–43, where there was a sharp dispute of the amount of damages; *Consumer's Money Order Corp. of America v. New Hampshire Ins. Co.*, 386 S.W.2d 674 (Mo.App.1964), involving a "theft policy" and the theft occurred outside of insured truck when driver of armored vehicle left truck to examine engine and was robbed, the "complexity of the issues" precluded a finding of the company acting vexatiously. See also; *Simpson v. National Casualty Co.*, 851 S.W.2d 665, 672 (Mo.App.1993); *United States Fire Ins. Co. v. Insurance Co. of North America*, 328 F.Supp. 43 (ED Mo.1971).

One of the most oft-cited cases in this area was written by Judge Trimble of this court in *Patterson*, 174 Mo.App. 37, 160 S.W. 59, 61 (1913). The policy was for the fire loss on a farmhouse, and the question was whether the insured had received the consent of the company to keep coverage when the house became vacant. The issues of notice and waiver were hotly contested but decided in favor of the insured. The opinion held the record did not disclose sufficient evidence to submit the vexatious question. *Id.* 160 S.W. at 60.

"It is true the whole question of vexatious delay is a question for the jury ... but it is only so when, from a general survey of all the facts and circumstances in the case, an inference can be drawn that the refusal was unjustifiable and vexatious," and should not be submitted as being wilful and without reasonable cause, as would appear to a "reasonable and prudent man before trial ..." *Id.* 160 S.W. at 62. See; e.g., *Otto v. Metropolitan Life Ins. Co.*, 228 Mo.App. 742, 72 S.W.2d 811, 817 (1934) (a close question of preexisting disease on a health policy); *Groves*, 540 S.W.2d at 42 (whether vehicle damage was caused by vandalism or owners' neglect, and company had substantial evidence no sugar had been poured into gas tank); *Strawbridge v. Standard Fire Ins. Co.*, 193 Mo.App. 687, 187 S.W. 79, 81 (1916) (where the company was given insufficient evidence as to value, condition and depreciation on the insured car); *Duckworth*, 452 S.W.2d at 287. (mixed questions of law and fact did not support submission).

This court's recent opinion in *Frost v. Liberty Mutual Ins. Co.*, 828 S.W.2d 915, 920 (Mo.App.1992), upheld the trial court's decision to refuse to award these damages where there were legitimate questions on the insurer's policy limits where there was also additional coverage on a rental car. The court held an insurer in good faith has a right to litigate an open question and get a judicial determination where there was no evidence of recalcitrance.

Finally, on a life policy, the company, after a general denial, contested the amount it owed where there had been loans taken against the value of the policy, and how much it owed. The court held on a value favorable to the beneficiary, but the plaintiff had made demand prior to trial only for the full amount or face value which had been denied by the company. The court in *Widdicombe v. Penn. Mut. Life Ins. Co.*, 241 S.W. 437, 439 (1922), held the company did not show by this conduct a lack of good faith so that it was meant to harass the plaintiff.

■ It can be fairly stated that the issues of offset and stacking were, from American's perspective and from the state of the law till the time of trial, debatable issues. As shown from the cases cited above, just having open issues of law or fact do not in and of themselves insulate an insurer from damages under § 375.296 and .420. See; e.g., *DeWitt*, 667 S.W.2d at 710. The fact that the company prevailed or lost at trial or on appeal does not necessarily dictate a result, for the issue of vexatious refusal is to be decided how the company responded from notice until trial, and from all the facts and circumstances whether it attempted to harass or vex its policyholder. *Id.*

Consideration of all the facts and circumstances in the case at bar still must be made in light of the two underlying contentions of offset and stacking, because those two issues greatly affected the amount of liability the company had and how much it offered to the insured. The stacking issue under American's policy language was not open and shut prior to trial. "The appellant may have a clearer concept of its liability after receipt of this decision, but we must consider the situation it faced before trial." *Hughes v. Great American Ins. Co.*, 427 S.W.2d 266, 272 (Mo. App.1968). The offset issue was somewhat unclear but was cleared up when, during the negotiations prior to trial, *Rodriguez* was handed down and clearly, under the American policy language, worked to reduce the stacked or unstacked policy amount with American's right to have those two issues litigated. What this case then boils down to is whether the additional acts complained of by Hopkins bring American's conduct to the jury for a decision.

In this case, American did make several offers of settlement. It did not stonewall, nor did it deny the claim, but made offers based on what it reasonably could have felt its policy covered. If the three policies did not stack, it would only owe $100,000, maximum. If it could deduct for the offset, it would owe $250,000 if stacking were allowed, and $50,000 otherwise. The offers of American do not bespeak of vexatious behavior. The court does not deduce the inference proposed by Hopkins of the company trying to settle very quickly on the hospital expenses and property damage so as to avoid payment of the underinsured coverage. In this decision whether or not to impose dam-

ages under a highly penal statute, though not approving American's delay of payment and not advising its insured of some underinsured coverage, this court cannot say singly, or combined with the other acts, that the conduct of American shows vexatious delay.

The court does not necessarily condone American's signal to the insured's attorney that it would move to disqualify, but under the facts of this case, what turned out to be only a threat, was followed by reasonable offers of settlement on knowledge of the law and facts it had at the time. Therefore, the court cannot say a submission of penalty was supported solely by this one act.

This court cannot, in any measure, authorize under the entire facts surrounding this claim, bolster a submission based on American's attempt to prove Mr. Hopkins' contributory fault. Suffice it to say this defense was not successful, but it cannot be said this was part of a pattern of recalcitrance.

These acts, singly or even cumulatively, do not make a submissible case for imposition of a penalty under § 357.420, for a willful refusal to pay, *Mears v. Columbia Mut. Ins. Co.*, 855 S.W.2d 389, 394 (Mo.App.1989). In that § 375.296 speaks in terms of a "refusal to pay," American here, despite the effect of attempting to disqualify Hopkins' lawyers, did, as footnote 4 sets out, consistently make offers to pay. Those offers were not measly nor arbitrarily arrived at under the extent of policy coverage. American promptly paid on medical and collision coverage, even though being somewhat tardy in advising the insured of underinsured coverage; but it did make legitimate offers on underinsured coverage.

Because the issues here were close and have given the court concern, the court cannot bring itself to impose the penalty, *Berryman v. Maryland Motorcar Ins. Co.*, 199 Mo.App. 503, 204 S.W. 738 (1918), and affirms the judgment N.O.V. on vexatious refusal.

One loose thread remains. The court, pursuant to Rule 84.13(c), raises the matter of the jury award of interest. In its verdict the jury found $153,900 due to Hopkins. This verdict for interest was submitted and rendered under Count III for vexatious refusal. Count III was eliminated under the judgment N.O.V., which the court has just affirmed. The question remains: Should the award for interest be maintained even if it was incorrectly submitted in the vexatious count, instead of the damage count?

Pre-judgment interest is allowed under § 408.040.2, RSMo 1994. Pre-judgment interest, among other purposes, helps to compensate plaintiffs for the true cost of money damage incurred, and it helps to promote settlement after monies become due on written contracts. *Twin River Constr. Co. v. Public Water Dist. No. 6*, 653 S.W.2d 682, 695 (Mo.App.1983). As was stated in *Weston*, 177 S.W. at 794, "interest is the penalty the law attaches to a delayed payment of just indebtedness ... but ... insurance companies had so frequently delayed ... the Legislature saw fit ... by adding attorney's fees and a penalty ..." where the company was vexatious in its refusal to pay.

The language of § .296 and .420 of Chapter 375 allows additional damages for vexatious refusal "in addition to the amount due under the contract of insurance and interest thereon" (.296), for "damages ... and a reasonable attorney's fee ..." (.420). This Missouri rule, 6A Appleman Insurance Law and Practice, § 4033 p. 53, allows only the penalty amounts plus attorney fees—interest on the contract amount of damages is to be submitted in the underlying claim. cf. *Mears*, 855 S.W.2d at 392; *Travelers*, 663 S.W.2d at 395 (fn. 1 and 2); *Hay*, 551 S.W.2d at 959. See MAI 10.08 (the penalty amount is figured on the amount deemed due under the policy, less interest and attorney fees).

*Victor v. Manhattan Life Ins. Co.*, 772 S.W.2d 826 (Mo.App.1989), applies to the unusual situation, not present in this case, where the insurer delayed payment of the contract amount for eighteen months and then paid the entire amount due under the terms of the policy. Victor's amount of damages on the underlying policy claim were the amount of loss pursuant to the delay (interest), and the court allowed the statutory penalty to be figured on that calculated amount. *Id.* 831–33.

The jury here clearly intended to, and gave interest. It would seem unjust to deny the Hopkins prejudgment interest on the amount of underinsured benefits due them on the wrongful death claim because interest was placed in the vexatious verdict form rather than in their underlying count for damages. It is impossible for this court to determine if the amount awarded is correct, based on the amount deemed due under count I for wrongful death (Mr. Hopkins claim under the verdict under Count II has not been appealed). *Lester v. Sayles*, 850 S.W.2d 858, 874 (Mo. banc 1993).

Since "it is permissible under Missouri law for the trial court, rather than the jury, to perform the mathematical process of computing interest[.]," the matter of computation of prejudgment interest is remanded to the trial court. *Dierker*, 859 S.W.2d 737.

The judgment is in all respects affirmed, and is remanded to the trial court to enter a judgment for pre-judgment interest.

All concur.