Steven L. **SHAFFER** and Larry E. Schell, Plaintiffs/Respondents/Appellants,

v.

**FEDERATED MUTUAL INSURANCE COMPANY,**
Defendant/Appellant/Respondent.

Nos. 19683, 19687.

Missouri Court of Appeals,
Southern District,
Division One.

July 14, 1995.

Motion for Rehearing or Transfer
Denied Aug. 3, 1995.

Harold F. Glass, Schroff, Glass & Newberry, P.C., Springfield, for appellants Shaffer and Schell.

Glenn A. Burkart, Burkart & Hunt, P.C., Springfield, for respondent Federated Mut. Ins. Co.

FLANIGAN, Judge.

Plaintiffs Steven L. Shaffer and Larry E. Schell, partners, d/b/a Shaffer Motors, brought this action against defendant Federated Mutual Insurance Company, seeking recovery under the "False Pretense Coverage" section of a "Commercial Package Policy" issued to them by defendant. The case was submitted to a jury, which found the issues in favor of plaintiffs and awarded them the sum of $61,000. Both sides appeal. The appeals have been consolidated in this court. Defendant's appeal will be considered first.

No. 19683—Defendant's Appeal

Defendant's first point is that the trial court erred in overruling its motion for a directed verdict filed at the close of all the evidence and in entering judgment in favor of plaintiffs pursuant to the verdict because: (a) there was no evidence that the 10 vehicles mentioned in the evidence were "covered autos," as defined in the policy, in that the 10 vehicles were not owned by plaintiffs, or consigned to plaintiffs for sale, or repossessed autos held by plaintiffs for sale, stor-

age or safekeeping; (b) there was no evidence that plaintiffs had legal titles to the 10 vehicles prior to any claimed loss thereof, and plaintiffs' evidence showed that the false pretense coverage portion of the policy did not apply and was excluded because plaintiffs did not have legal title to the 10 vehicles; (c) there was no evidence that plaintiffs ever had possession of any of the 10 vehicles or possession of assigned certificates of title to any of them, so plaintiffs could not have voluntarily parted with any of the 10 vehicles; (d) there was no evidence that plaintiffs ever acquired any of the 10 vehicles from a seller who did not have legal title to them in that the purported seller, Pearce, never delivered any of the 10 vehicles or their assigned certificates of title to plaintiffs.

Defendant's second point, advanced alternatively, is that Instruction 6, plaintiffs' verdict-director, was reversibly erroneous.

For the reasons which follow, this court holds: There was no coverage with respect to 9 of the 10 vehicles; as to the tenth vehicle, a 1987 Bronco, issues of fact exist as to its coverage; Instruction 6 is reversibly erroneous and a new trial is ordered with respect to whether coverage exists on the Bronco.

In reviewing the trial court's ruling on defendant's motion for a directed verdict this court must view the evidence in the light most favorable to the plaintiffs, and they are to be given the benefit of all reasonable inferences. *Black v. Kansas City Southern Ry. Co.*, 436 S.W.2d 19, 23[1] (Mo. banc 1968). A [trial] court should never withdraw a question from the jury, unless " 'all reasonable men, in the honest exercise of a fair, impartial judgment, would draw the same conclusion from the facts which condition the issue.' . . . Where there is uncertainty arising 'from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury.' " *Walton v. United States Steel Corporation,* 362 S.W.2d 617, 621 (Mo.1962) (citations omitted).

In *Gabriel v. Shelter Mut. Ins. Co.*, 897 S.W.2d 119 (Mo.App.1995), this court said, at 120–121[1–6]:

"The law of contracts applies to an insurance policy, and any claim or suit by either party must be based on the policy issued. The policy should be construed as a whole. To determine the intention of the parties to an insurance contract, the entire policy and not detached provisions or clauses must be considered. If the language of an insurance contract is clear and unambiguous, the court does not have the power to rewrite the contract for the parties and must construe the contract as written. The court's function is to construe, not make, insurance contracts.

Existing and valid statutory provisions enter into and form a part of all contracts of insurance to which they are pertinent and applicable as fully as if such provisions were written into them." (citations omitted).

In *Meyer Jewelry Co. v. Gen. Ins. Co. of Am.*, 422 S.W.2d 617 (Mo.1968), the court said, at 623[1, 2]:

"We follow a construction favorable to the insured wherever the language of a policy is susceptible of two meanings, one favorable to the insured, the other to the insurer. Provisions restricting coverage are particularly construed most strongly against the insurer. '. . . [A]n insurance policy being a contract designed to furnish protection will, if reasonably possible, be interpreted so as to accomplish that object and not to defeat it, and, if terms of the contract are susceptible of two possible interpretations and there is room for construction, the provisions limiting or cutting down on the coverage of the policy, or avoiding liability therefor, will be construed most strongly against the insurer.' " (citations omitted).

In *Rodriguez v. General Acc. Ins. Co.*, 808 S.W.2d 379 (Mo. banc 1991), the court said, at 382[2–5]:

"An ambiguity arises when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract. If there is a conflict between a technical definition within a contract, and the mean-

ing which would reasonably be understood by the average lay person, a lay person's definition will be applied unless it plainly appears that the technical meaning is intended. A court is not permitted to create an ambiguity in order to distort the language of an unambiguous policy, or, in order to enforce a particular construction which it might feel is more appropriate. Thus, where insurance policies are unambiguous, they will be enforced as written absent a statute or public policy requiring coverage." (citations omitted).

█ The "False Pretense Coverage" endorsement to the policy reads, in pertinent part:

## A COVERAGE

1. a. We will pay for "loss" to a covered "auto" under False Pretense Coverage that results from someone causing you to voluntarily part with the covered "auto" by trick, scheme or under false pretenses.

   b. We will pay for "loss" to any "auto" under False Pretense Coverage that results from your acquiring the "auto" from a seller who did not have legal title.

## EXCLUSIONS

2. a. . . .

   b. This insurance does not apply under paragraph A.1.a. unless:

   (1) You had legal title to the covered "auto" prior to "loss".

   (2) You make every effort to recover the covered "auto" when it is located.

The policy definitions include the following:

"Covered autos"—"Owned autos; autos left with you on consignment for sale; autos which have been repossessed and are held by you for sale, storage or safekeeping."

"Auto"—"A land motor vehicle, trailer or semi-trailer."

"Loss"—"Direct and accidental loss or damage."

The testimony of plaintiff Steven Shaffer, the only testimony material to this appeal, included the matters set forth in the following eight paragraphs:

I have been in the automobile business over 23 years, dealing in both new and used cars. I have known Kenneth Pearce for over four years, and I have purchased cars from him on numerous occasions. Pearce was a wholesaler. I am both a wholesaler and retailer. It was not unusual for me to pay him before I actually had the car on my lot. Until October 23, 1990, I trusted Pearce.

On October 23, 1990, I paid Pearce for five vehicles. Pearce provided me with a list of those automobiles with vehicle identification numbers. Exhibit 3[1] is that list which Pearce wrote. I gave Pearce a check for $32,100. Pearce told me the vehicles were in Oklahoma. Pearce told me that he had bought the cars in Oklahoma, and mentioned Tulsa. Our agreement was that the cars were to be delivered at my lot [in Springfield] and that Pearce was to arrange that. I expected the cars to arrive on Friday, October 26.

On Thursday, October 25 or Friday, October 26, Pearce drove a 1987 Bronco onto my car lot in Springfield. Pearce told me it was a vehicle I bought. I did not check the identification number of the vehicle. It could have been another 1987 Bronco. I asked Pearce to leave that car on my lot, but he said he didn't have a way back to his home in Lebanon. I allowed him to take the Bronco home that afternoon. Pearce told me that the cars were not going to be there Friday. I told him I was leaving to go on a hunting trip and that when I got back on Monday we would take care of it.

On October 30, I saw Pearce again. He talked with me about delivering the five cars

---

1. Exhibit 3 reads:
   "86 Wagoneer—$7000.00
   1JCWC77226T046212
   87 Honda Accord—$7600.00
   JHMST3431H505009
   87 Toyota Camary—$6500.00
   JT2AE82E6H317036
   86 Ford Pu 4 x 4—$5500.00
   1FTFF25Y3GKAY42356
   85 GMC Suburban—$5500.00
   1GSEC16L6FFS16638"

with some other cars I might be interested in purchasing. I agreed to buy five more cars from him and gave him a check for $33,100. Exhibit 5[2] is a list given me by Pearce, showing the automobiles and their vehicle identification numbers. Pearce wrote up the list. Nothing about these two transactions caused me to be suspicious of Pearce.

On November 3 or November 4, when I did not receive any of the vehicles, I tried unsuccessfully to reach Pearce by phone. I drove to his home in Lebanon and found him there. I learned he was not going to be able to bring me the 10 cars from Oklahoma. I asked him where my cars were, and he said he did not have them. I asked him where my titles were, and he said he did not have them. I asked him where my money was, and he said he had spent it. I had spent $65,200 on cars that I could not get and did not know where they were.

I contacted a private investigator and paid him to find out why this happened. I contacted the prosecuting attorney in Webster County and a warrant was issued for Pearce's arrest. On or about December 15, 1990, I contacted Federated and made a claim on my false pretense coverage. On January 2, 1991, I received a letter from Federated, Exhibit 6, informing me they were not going to pay my claim. On December 17, 1991, Pearce pleaded guilty to a charge of stealing and, as part of that plea, he agreed to make payments to me of $500 a month. In 1993 I received a check for $21,-500 from Pearce's insurance company, Western Surety, including interest on my losses. I figured my loss up to the date of trial to be $62,403.33, and I am asking the jury to award that amount as actual damages.

When I pay for an automobile it is my position that I own it. I felt that whenever I paid for an automobile I had acquired it. It is my position that if I wanted to I had a right to go to Oklahoma and pick up the cars,

but that was not my understanding with Pearce.

Pearce was to deliver all 10 cars and all of their titles, but they didn't show. I did not check to determine anything about the identification numbers of the vehicles or whether they matched the cars. I don't know whether these cars were correctly identified by their vehicle identification numbers or whether they ever existed. I have paid dealers and people for cars before I had them on my lot.

In Exhibit 6, a letter to plaintiffs dated January 2, 1991, defendant denied coverage. The letter stated, in pertinent part:

"It is our understanding you made a verbal agreement to purchase vehicles from K.P. Motors. The owner of K.P. Motors, Ken Pearce, breached this agreement. It is our understanding you issued two separate checks for purchase of the vehicles but there were no contracts or receipts. The titles and vehicles were never delivered to you as promised.

"We have reviewed your insurance policy and False Pretense Coverage Endorsement CA–F–30. Please refer to [Coverage A.1.b. quoted].

"It is our position that your company never acquired the vehicles in question. Therefore, we will be unable to make any payment of this claim under the False Pretense Coverage afforded under your policy.

. . . . .

"Since your policy does not provide coverage for this loss, we will be unable to make any payment."

In *Nixon v. Life Investors Ins. Co. of America*, 675 S.W.2d 676 (Mo.App.1984), the court said, at 679[2–4]:

"The general rule in insurance cases is that plaintiff makes a prima facie case of coverage by establishing issuance and deliv-

---

**2.** Exhibit 5 reads:
"87 Bronco—$8000
1FMBU14SXHUD10863
89 Suburu GL—$5800.00
JF1AM43H3KB429775 S.L.S.
88 Camary—$7000.00
JT2AE86C3J350056844
87 Pulsar—$5500.00

JN1MN2458HM004861
87 S–10 Blazer—$6800.00
168CT18B6H8144334"
The reader will note that a 1987 Bronco was not listed on Exhibit 3. A Bronco is listed on Exhibit 5, which was not given to plaintiffs until October 30.

ery of the insurance policy, payment of the premium, *a loss caused by a peril insured against,* notice of loss and proof of the loss given to the insurer as the policy requires. When the insurer relies on an exclusion in the insurance contract as the ground to deny a claim, the burden is on the insurer to establish that the loss is within the policy exclusion and a motion for a directed verdict in favor of the insurer may not be sustained *unless the plaintiff in its own evidence has established the exclusion.* Once the plaintiff has established a prima facie case, the general rule is that the case may not be taken from the jury because the plaintiff has the right to have the jury pass on the credibility of defendant's witnesses and the weight of their testimony." (citations omitted; emphasis added).

■ Where a loss, otherwise within coverage of a policy, is not covered by reason of an exclusion, the insurer must plead the exclusion as an affirmative defense. *Kammeyer v. Concordia Telephone Company,* 446 S.W.2d 486, 491[6] (Mo.App.1969). On the other hand, "[i]t is not necessary to plead as affirmative defenses policy provisions defining the coverage." *Noll v. Shelter Ins. Companies,* 774 S.W.2d 147, 149[2] (Mo. banc 1989).

■ "The construction of written contracts is ordinarily a question of law, not fact." *Anchor Centre Partners v. Mercantile Bank,* 803 S.W.2d 23, 32[16] (Mo. banc 1991). The trial court's construction of the contract, being a legal conclusion, is not binding on appeal. *Id.* [17]. "The interpretation of the meaning of the insurance policy is a question of law." *Moore v. Commercial Union Ins. Co.,* 754 S.W.2d 16, 18[2] (Mo.App.1988).

■ Section 301.210.4 [3] reads:

"It shall be unlawful for any person to buy or sell in this state any motor vehicle or trailer registered under the laws of this state, unless, at the time of the delivery thereof, there shall pass between the parties such certificates of ownership with an assignment thereof, as provided in this section, and the sale of any motor vehicle or trailer registered under the laws of this state, without the assignment of such cer-

tificate of ownership, shall be fraudulent and void."

A sale contrary to the statute "is fraudulent and void." *Greer v. Zurich Insurance Company,* 441 S.W.2d 15, 25[5] (Mo.1969). A contract for the sale of a motor vehicle registered under Missouri law without assignment and delivery of the certificate of title is unlawful and may be repudiated while the transaction remains executory in that the title documents have not been delivered. *Id.* [6]. A buyer of a motor vehicle who has fully paid the purchase price but has received no certificate of title acquires neither title nor the right to possession of the motor vehicle. *Id.* at 26; *Bank of Jasper v. Langford,* 459 S.W.2d 97, 100[5] (Mo.App.1970). The attempted transfer of ownership of a used motor vehicle is fraudulent and void unless, as a reasonably contemporaneous part of the transaction, the previously issued certificate is properly assigned and acknowledged by the transferor and delivered to the transferee. *Bank of Jasper,* at 100[5]. Section 301.210 is designed to hamper traffic in stolen cars and to prevent fraud and deceit in the sale of used cars. It is a police regulation of the highest order and should be liberally construed to accomplish its purpose. *Greer,* at 26[9].

Section 301.210.4 "is applicable to automobiles titled or purchased in other states and brought to Missouri to be sold." *Pearson v. Allied Finance Co.,* 366 S.W.2d 6, 8[2] (Mo.App.1963). "The fact that the title to plaintiff's truck was of Maryland origin does not alter the necessity of compliance with § 301.210. *Lebcowitz v. Simms,* 300 S.W.2d 827 (Mo.App.1957). The statute is applicable to all sales made in Missouri, irrespective of the origin of the certificate of title." *Fawley v. Bailey,* 512 S.W.2d 477, 479[1] (Mo.App. 1974). Similarly, in *Moore v. State Farm Mutual Auto. Ins. Co.,* 381 S.W.2d 161 (Mo. App.1964), the court said, at 164[1]:

"Section 301.210 is applicable and controlling '[i]n the event of a sale or transfer of ownership of a motor vehicle or trailer [in Missouri] for which a certificate of own-

---

**3.** All references to statutes are to RSMo 1994, V.A.M.S.

ership has been issued,' either in this or another state." (citations omitted).

In order for plaintiffs to make a prima facie case, they had to show, among other things, "a loss caused by a peril insured against." *Nixon*, at 679[2]. The only coverage provisions upon which plaintiffs could possibly rely are coverages A.1.a. and A.1.b.

Coverage A.1.a. applies only to a loss to a "covered auto" that results from someone causing [the insured] to voluntarily part with it by trick, scheme or false pretense. To be a covered auto, it must be an automobile owned by the insured or one left with the insured on consignment for sale or one which has been repossessed and held by the insured for sale, storage or safekeeping.

Plaintiffs have not claimed that any of the automobiles was left with them on consignment for sale or that any of them was a repossessed auto held for sale, storage or safekeeping. None of the vehicles, including the 1987 Bronco, qualifies as an "owned auto" because plaintiffs did not become the owners of any of them, there having been no compliance with § 301.210. It is also true, except possibly with respect to the Bronco, that plaintiffs did not "voluntarily part" with any of the automobiles because plaintiffs were never in possession of any of them.

So far as the Bronco is concerned, if it is assumed that the one driven by Pearce was the one identified on Exhibit 5, exclusion 2.b.(1) eliminates the Bronco from coverage A.1.a. because plaintiffs at no time had legal title to the Bronco (or to any of the other nine vehicles).

With respect to Coverage A.1.a. plaintiffs argue that defendant did not rely on the exclusion 2.b(1), that defendant's position has always been that the vehicles were not "acquired" within the meaning of coverage A.1.b., and that defendant "waived its right to now insist there was no coverage for some other reason." That position is factually and legally unsound.

In *Brown v. State Farm Mut. Auto. Ins. Co.*, 776 S.W.2d 384 (Mo. banc 1989), the court discussed the "general rule" announced in prior cases that an insurer, having denied liability on a specified ground, may not there-after deny liability on a different ground. The court said that the rule had its roots in the doctrine of waiver and estoppel, which are different legal doctrines. The court said, at 388–389:

> "[I]n the absence of either (1) *an express waiver by the insurer or* (2) *conduct which clearly and unequivocally shows a purpose by the insurer to relinquish a contractual right*, the insured must show prejudice before the rule may be invoked.... [E]stoppel requires '(1) an admission, statement or act inconsistent with the claim afterwards asserted and sued upon, (2) action by the other party on the faith of such admission, statement or act, and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement, or act.' Thus, under an estoppel theory, the insurer must first announce a specific defense and subsequently seek to rely instead on an inconsistent theory.

> . . . . .

> *[A]bsent a statement which excludes other defenses and upon which the insured reasonably relies in preparing to preserve its claim, estoppel is not applicable. And where the insurer's initial denial is stated in such a way that it reasonably implies the subsequently, but more specifically stated, consistent reason for denial, the insured cannot claim she changed her position or relied to her detriment on the insurer's initial denial; estoppel may not be invoked."* (citations omitted; emphasis added).

The court, in *Brown*, at 388, overruled earlier cases which held "that the mere trouble and expense of bringing suit is sufficient prejudice to support estoppel in all cases...."

Defendant's letter of January 2, 1991, stated, "The titles and vehicles were never delivered to you as promised." There is nothing in the letter to support plaintiffs' argument of waiver. The letter relied on the fact that plaintiffs obtained neither possession nor legal title to any of the 10 vehicles. That remains defendant's position. Plaintiffs make no mention of estoppel, but even if they

did there was no inconsistency between the denial letter and defendant's position at the trial.

In one sense, coverage A.1.b. is broader than coverage A.1.a., in that A.1.b. applies to "any auto," while coverage A.1.a. applies only to a "covered auto." To enable plaintiffs to qualify for coverage under A.1.b., it was necessary for plaintiffs to sustain a loss to any auto that resulted from plaintiffs' "acquiring" the auto from a seller who did not have legal title.

Webster's Third New International Dictionary defines "acquire" as follows: "to come into possession, control, or power of disposal of, often by some uncertain or unspecified means."

Setting aside the matter of the Bronco for a moment, plaintiffs did not acquire any of the other nine vehicles listed on Exhibits 3 and 5. Plaintiffs did not come into possession of any of them. Indeed, there was no showing that any of them existed. At no time did plaintiffs control any of the nine vehicles. Plaintiffs did not have the power to dispose of any of the nine vehicles. The transactions between plaintiffs and Pearce with respect to them were void and unlawful. Plaintiffs did not acquire from Pearce any of those vehicles. They acquired only two pieces of paper, each purporting to list five specific vehicles.

This court holds that there was no coverage under A.1.a. because none of the 10 vehicles was a "covered auto." This court holds there was no coverage under A.1.b. with respect to nine of the 10 vehicles, those other than the Bronco, because plaintiffs did not "acquire" any of the nine vehicles.

■ The Bronco presents a different situation. Although there may be inconsistencies between Shaffer's testimony and statements he attributed to Pearce, this court does not weigh the evidence in a jury case. There was testimony, if believed, that the Bronco listed on Exhibit 5 was driven by Pearce to plaintiffs' car lot in Missouri, that Pearce asked for and obtained the permission of Shaffer to drive the Bronco to Lebanon, and Shaffer gave permission for him to do so. It is true that there was no evidence

that the vehicle identification number on that Bronco matched the one shown on Exhibit 5. The fact remains that Pearce said it was the same vehicle.

Although Pearce did not testify, the statements attributed to him by Shaffer were received in evidence without objection, and some were elicited by defense counsel. "It is the established rule that hearsay evidence, if not objected to, is admissible and may be considered, along with other evidence, in determining whether a submissible case has been made." *Conlon v. Roeder,* 418 S.W.2d 152, 159[5] (Mo.1967).

It is therefore arguable, or at least the jury could find, that plaintiffs acquired the Bronco since they were momentarily in physical possession of it and granted Pearce consent to use it. It is a reasonable inference that Pearce did not have legal title to the Bronco. It follows that defendant's motion for directed verdict was proper with respect to nine of the vehicles, but not with respect to the Bronco. Issues of fact exist on whether the Bronco qualified for coverage under A.1.b. That matter will be the subject of the new trial.

Defendant's second point challenges Instruction 6, plaintiffs' verdict-director, on the ground it was not supported by the evidence. Instruction 6 submitted, in the disjunctive, the issues of whether the 10 vehicles were covered under either Coverage A.1.a. or A.1.b. This court has held that, as a matter of law, none of the 10 vehicles was covered under A.1.a.

"There must be evidentiary support for each disjunctive submission; if not, the instruction is defective, erroneous and requires a new trial." *Layton v. Pendleton,* 864 S.W.2d 937, 943[15] (Mo.App.1993). See also *Wolfe v. Harms,* 413 S.W.2d 204, 209–210[1] (Mo.1967). Instruction 6 was erroneous because there was no evidence to support the portion of it, submitted disjunctively, based on Coverage A.1.a.

The judgment is reversed and the cause remanded for new trial, confined to the issue of whether the 1987 Bronco listed on Exhibit 5, and any loss to it, was within Coverage A.1.b.

No. 19687—Plaintiffs' Appeal

■ Plaintiffs' sole point is that the trial court erred in refusing to admit into evidence plaintiffs' Exhibit 9 and in refusing to give Instruction A tendered by plaintiffs, "because the evidence showed that defendant (1) made no reasonable effort to talk to Kenneth Pearce and (2) conducted no real investigation of the claim and the result of the trial court's rulings was that plaintiffs' attorney could not argue for damages for vexatious delay and attorneys' fees and the jury could not return a verdict for such as contemplated by § 375.420 V.A.M.S."

■ "To support the imposition of the penalty under [§ 375.420], plaintiff must show that the insurer's refusal to pay the loss was willful and without reasonable cause, as the facts would appear to a reasonable and prudent person." *DeWitt v. American Family Mut. Ins. Co.*, 667 S.W.2d 700, 710[30] (Mo. banc 1984). Whether a refusal to pay is vexatious or not must be determined by the situation as presented to the insurer at the time it was called on to pay. *Hopkins v. American Economy Ins. Co.*, 896 S.W.2d 933, 939[6] (Mo.App.1995). Section 375.420 is penal in nature and is to be strictly construed. *Id.* [7]. Where there is an open question of law or fact, the insurer may insist on a determination without being penalized. *Id.* [9]. "Each case literally must be decided on its own merits." *Id.* at 941.

In *Groves v. State Farm Mut. Auto. Ins. Co.*, 540 S.W.2d 39 (Mo. banc 1976), the court said, at 42[1, 2]:

"The law is well settled that the penalty for vexatious refusal of an insurance company to pay the claim of its insured should not be imposed unless the facts and circumstances surrounding the company's refusal to pay show that the refusal was wilful and without reasonable cause or excuse, as the facts would have appeared to a reasonable person before trial. An insurance company may question and contest an issue of fact relating to its liability if it has reasonable cause to believe, and does believe, that there is no liability under its policy and that it has a meritorious defense. The mere fact that the trial judgment is adverse to a defendant's contention is not sufficient reason for imposing the penalty."

The proffered exhibit and instruction were properly rejected by the trial court. As the opinion in the companion appeal demonstrates, defendant was justified in denying coverage of the 10 vehicles, because nine of them were not covered as a matter of law and there was at least a question of fact as to coverage with respect to the Bronco. Plaintiffs' appeal has no merit. The mandate in the companion appeal governs any retrial. It is so ordered.

SHRUM, C.J., and MONTGOMERY, J., concur.