

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

ISAIAH RIDER, a Minor, by and through his Natural Mother and Next Friend, MICHELLE RIDER,

        Appellant-Respondent,

v.

THE YOUNG MEN'S CHRISTIAN ASSOCIATION OF GREATER KANSAS CITY,

        Respondent-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**WD76680**
**(Consolidated with WD76711)**

**OPINION FILED:**
**January 13, 2015**

---

### Appeal from the Circuit Court of Jackson County, Missouri
### The Honorable Charles H. McKenzie, Judge

**Before Division II:** Joseph M. Ellis, Presiding Judge, and
Victor C. Howard and Mark D. Pfeiffer, Judges

Isaiah Rider ("Rider"), by and through his next friend and mother, Michelle Rider ("Mother"), appeals the judgment of the Circuit Court of Jackson County, Missouri ("trial court"), following a jury trial, which awarded him damages against The Young Men's Christian Association of Greater Kansas City ("YMCA") in the amount of $590,652.50. On appeal, Rider claims that the trial court erred in submitting a failure to keep a careful lookout comparative fault instruction because there was no evidence supporting it. YMCA filed a cross-appeal alleging

four points of error and filed a motion to strike a portion of Rider's appellate reply brief. We grant Rider's point on appeal, deny YMCA's points on cross-appeal, deny YMCA's motion to strike,[1] and hereby enter the judgment the trial court should have entered, which is to award Rider the full amount of damages found by the jury, not reduced by any percentage of comparative fault.

## Factual and Procedural Background

Rider was six years old in December of 2003. He attended an after-school daycare that was run by YMCA at a facility located in Kansas. On December 16, 2003, YMCA staff directed the children in the after-school daycare to play outside on the playground. There was melting snow and melting ice on the playground where the children were playing. After some time, YMCA staff directed the children to come back into the building through a door that led from the playground directly into the cafeteria, which had a smooth tile floor. There was no floor mat at or near the door on which the children could dry their feet. YMCA staff then directed the children to cross the cafeteria to a large communal sink where the children were told to wash their hands. Again, no floor mat was placed near the sink to absorb any water that might splash or drip from the sink or from the hands or shoes of the children standing at the sink. Rider was the last child to wash his hands. After the children washed their hands, YMCA staff directed them to cross the cafeteria tile floor again and line up. After Rider left the sink and was crossing the cafeteria heading toward the other children, he slipped on the tile floor, fell, and broke his left tibia. Although Rider had not seen any water on the floor, he believed that he had slipped in

---

[1] In his reply brief, Rider responds to one of YMCA's arguments regarding the "mitigation of damages" instruction. YMCA argues that the reply brief should be stricken because Rider is allegedly raising a new claim of error—that the "mitigation of damages" instruction should not have been given. We disagree. Rider has consistently maintained that there is no evidence in the record supporting the imposition of a comparative fault percentage against Rider, and as we explain in our ruling today, there is nothing about the "mitigation of damages" instruction that directs the jury to utilize the "mitigation of damages" instruction to impose a percentage of fault to Rider. Rider is not injecting new allegations of error in his reply brief. Instead, Rider is merely responding to the arguments raised by YMCA in its initial appellate briefing. YMCA's motion to strike is denied.

2

some water, because his clothes were wet after his fall but not before. Mother testified that, upon arriving at the scene, she was told by YMCA staff that her son had "fallen and slipped in water."

Although one YMCA staffer, Jean Phillips ("Phillips"), initially reported to an investigator that she did not see Rider fall, she testified at trial that she did see Rider fall and that he did not slip in any water but merely tripped over his own feet. Phillips also wrote on an accident report that there should have been a floor mat on the floor. Another YMCA staffer, Tiffany Haymon ("Haymon"), also would later testify that she saw Rider fall but that she did not see any water on the floor before or after his fall. None of the YMCA staff persons testified that Rider had violated a command or safety rule, was guilty of horseplay, or had ambulated in such a way that was unusual (for Rider) or lacking in care as to any plainly visible dangerous conditions on the floor. Instead, all of the YMCA staff persons testified that they did not observe any plainly visible dangerous conditions on the floor and, frankly, did not believe that any existed at the time of Rider's fall.

Because Rider had a condition called congenital pseudoarthrosis,[2] the tibia fracture that Rider suffered in his fall did not heal normally; he had to have several surgeries, had to have rods placed in his bone, and had to spend many months with his leg in a cast and then a brace so that he was not bearing weight on the leg. The combination of the pseudoarthrosis and the lengthy absence of weight bearing caused the bones in his left leg, ankle, and foot to incur osteopenia, which is a loss of bone tissue and bone density. The result was that Rider suffered several subsequent fractures to the bones in his left leg. The muscles in his lower left leg also began to atrophy. The problem compounded, and Rider required more surgeries over the next several years. His left leg also became shorter than his right leg, and he had to have a procedure to stunt

---

[2] Rider was born with the congenital pseudoarthrosis; however, before his fall in the YMCA's care and supervision, he had not shown any signs of osteopenia, nor had he had any fractures.

3

the growth of his right leg so that it would not become too much longer than his left leg. Ultimately, it became clear to Rider, his family, and his doctors that Rider's left leg would not heal, and the leg was amputated below the knee. At some point during his treatment, Rider and Mother moved from Kansas to Missouri.

Rider, through Mother as his next friend, sued YMCA, a Missouri corporation, for premises liability and negligence in the trial court—a Missouri state court. Shortly before trial, YMCA argued via motion in limine that the trial court should use Kansas law and Kansas jury instructions to set forth the standards for its liability, for any comparative fault on Rider's part, and for any damages available to Rider (Kansas does not allow a plaintiff to collect any damages if he is found to be more at fault than the defendant, and it has a cap on non-economic damages). The trial court ruled that since YMCA had established that there was a difference between Missouri and Kansas law with respect to the elements of premises liability and because Rider's accident had occurred in Kansas, it would instruct the jury on premises liability under Kansas standards. However, because YMCA had not shown any substantive difference between Missouri and Kansas law with respect to the elements of negligence, the trial court ruled that it would use the Missouri MAI instruction for negligence. Finally, because Rider and YMCA were both Missouri residents, and the trial court found that Kansas did not have any interest in limiting the recovery of damages as between two Missouri residents, the trial court determined that it would apply Missouri law on Rider's "right of recovery."

At the conclusion of a two-week jury trial, Rider elected to submit exclusively his negligence claim to the jury—abandoning the premises liability claim. The jury found that YMCA was negligent, and it found that Rider had suffered damages in the amount of $5,906,525.00. The jury also found that Rider was 90% at fault for failing to keep a careful

4

lookout. Accordingly, the trial court entered judgment reducing the award by 90%, which left an amount of $590,652.50. This appeal follows.

### Rider's Appeal

***Submission of Comparative Fault Instruction:***

Rider appeals the trial court's comparative fault jury instruction that was submitted to the jury. Whether a jury was properly instructed is a question that an appellate court reviews *de novo*. *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo. banc 2010). However, we review the record in the light most favorable to the submission of the instruction. *Id.* "Any issue submitted to the jury in an instruction must be supported by substantial evidence from which the jury could reasonably find such issue." *Id.* (internal quotation omitted). "Substantial evidence is evidence which, if true, is probative of the issues and from which the jury can decide the case." *Id.* (internal quotation omitted). If there is not substantial evidence to support the giving of the instruction, reversal is warranted "'only if the error resulted in prejudice which materially affects the merits of the action.'" *Id.* (quoting *Bach v. Winfield-Foley Fire Prot. Dist.*, 257 S.W.3d 605, 608 (Mo. banc 2008)).

The "careful lookout" comparative fault instruction given in this case was as follows:

Instruction No. 9

In your verdict you must assess a percentage of fault to plaintiff, whether or not defendant was partly at fault, if you believe:

First, plaintiff failed to keep a careful lookout, and

Second, plaintiff was thereby negligent,[3] and

---

[3] From Instruction No. 6, "negligence" attributed to Rider was defined as follows: "The term 'negligent' or 'negligence' as used in these instructions with respect to Isaiah Rider means the failure to use that degree of care which an ordinarily careful boy of the same age, capacity and experience would use under the same or similar circumstances."

5

Third, such negligence of plaintiff directly caused or directly contributed to cause any damage plaintiff may have sustained.

This instruction was offered by YMCA. Rider objected to the submission of the instruction because he claimed that the instruction was not supported by substantial evidence from which the jury could reasonably find the issue of "careful lookout." We agree.

The essence of a failure-to-keep-a-careful-lookout claim is a failure to see and a failure to act. *Id.* The instruction is not to be given unless there is substantial evidence that the allegedly (comparatively) negligent party could have seen the danger and could have taken effective precautionary action to avoid it. *Id.* Stated another way:

> Although it is generally said that a person walking . . . is not required to look down at his feet or the pavement at every step or to survey the pavement with a "critical eye," or walk with his eyes "glued upon" the pavement, the law is also that where a duty to look exists, it is contributory negligence to fail to see what is *plainly visible*.

*Thomas v. First Nat'l Bank of Richmond*, 561 S.W.2d 719, 721 (Mo. App. 1978) (emphasis added).

In *Fehlbaum v. Newhouse Broadcasting Corp.*, the court stated, "Missouri courts have consistently held that where a duty to look exists it is contributory negligence to fail to see what is *plainly visible*." 483 S.W.2d 664, 665 (Mo. App. 1972) (emphasis added). "A person, however, is not required to look for danger where there is no cause to anticipate it." *Id.* In *Webb v. City of Clayton*, the court held that a failure to keep a careful lookout instruction was unsupported by the evidence because the evidence did not support a finding that the plaintiff had knowledge of a depressed sewer grate before it caused her fall. 494 S.W.2d 662, 664 (Mo. App. 1973). In *Helfrick v. Taylor*, the Supreme Court of Missouri held that a failure to keep a careful lookout instruction was proper because the wooden threshold and missing tiles that caused the plaintiff's fall were plainly visible, and she failed to see them because she was admittedly

6

distracted. 440 S.W.2d 940, 945 (Mo. 1969). In *Wyatt v. Southwestern Bell Telephone Co.*, the court held that a failure to keep a careful lookout instruction was proper because plaintiff was admittedly distracted, and there was at least a dispute in the evidence about whether the uneven sidewalk was plainly visible prior to plaintiff's trip and fall. 573 S.W.2d 386, 390 (Mo. App. 1978). In *Spann ex rel. Spann v. Jackson*, a case involving a child, the court found that a failure to keep a careful lookout instruction was proper where the child had been instructed to stay away from the lawn mower while defendant was operating it, the child understood the lawn mower was dangerous, and the child still chose to approach the lawn mower while in operation—leading to a serious foot injury. 84 S.W.3d 478, 480-81 (Mo. App. E.D. 2002).

"If there is evidence from which a jury could find that plaintiff's conduct was a contributing cause of [his] damages, parties to a negligence action are entitled to have their case submitted to the jury under comparative fault principles . . . ." *Rudin v. Parkway Sch. Dist.*, 30 S.W.3d 838, 841 (Mo. App. E.D. 2000). That said, when as here, a party tenders a "careful lookout" comparative fault instruction, that party bears the burden of coming forward with substantial evidence to support the giving of *that* instruction. And in "careful lookout" cases, the critical evidence hinges upon whether some conduct of the party has distracted the party from seeing a *plainly visible* dangerous condition that leads to injury.

Here, whether Rider—a six-year-old child—was walking,[4] hopping, trotting, skipping,[5] or running,[6] there simply is no evidence in the record that there was a *plainly visible* wet floor. Yet, there was evidence *after* the fall (Rider's clothing was dry *before* the fall and wet *after* the

---

[4] YMCA proffered testimony from YMCA staff that Rider was walking and simply tripped over his own feet.

[5] YMCA proffered testimony from YMCA staff that, due to Rider's congenital condition that resulted in a bowed tibia, Rider's normal gait was "more like a trot-run, a skip. . . . [I]t wasn't an up-and-down walk."

[6] A medical chart entry from an emergency treatment record for which the author and source of information is unclear suggested that Rider was "running" immediately prior to his fall.

7

fall), that the tile floor had become wet and that Rider slipped on that wet floor. Every single witness who was present at the time of Rider's fall, including Rider himself, testified that he or she did *not* see the wet condition of the tile flooring *before* Rider's fall. In fact, YMCA staff—in the face of evidence reflecting that Rider's clothing effectively acted as a "mop" of sorts during the fall—testified that there simply was *not* a wet floor condition at the time of Rider's fall. Thus, *everybody* agrees on one thing: there was no "plainly visible" wet condition on the tile floor upon which Rider slipped and fell.

Simply put, without a plainly visible condition upon the tile floor, there is no substantial evidence supporting the giving of a "careful lookout" comparative fault instruction. In other words, there was no substantial evidence that Rider could or should have seen a plainly visible danger and taken precautionary action to avoid it. *Hayes*, 313 S.W.3d at 650. Thus, the trial court erred in submitting Instruction No. 9, the "careful lookout" comparative fault instruction. "The improper submission is prejudicial because [Rider] was assessed a percentage of comparative fault for the accident as a result of the erroneous instruction, and his damages were reduced by that percentage." *Id.* at 652.

YMCA attempts to negate any claim of prejudice by arguing that the jury's finding that Rider was 90% at fault *could have been* due to the jury's finding that Rider failed to mitigate his damages. There is no merit to this contention. The instruction that YMCA proffered relating to failure to mitigate damages did *not* direct the jury to use the instruction to assess a percentage of fault to Rider. The instruction, as patterned after MAI 32.29 [2002 New]—Failure to Mitigate Damages,[7] stated:

---

[7] Prior to 2002, there was no uniform method of submitting the doctrine of mitigation of damages. The Committee Comment to MAI 32.29 discusses this lack of uniformity. The MAI Committee cites to *Love v. Park Lane Medical Center*, 737 S.W.2d 720 (Mo. banc 1987), where the plurality opinion suggested using a comparative fault approach (and the jury instruction in question expressly directed the jury to assess a percentage of fault to

Instruction No. 10

If you find in favor of plaintiff, you must find that plaintiff failed to mitigate damages if you believe:

First, plaintiff failed to limit his physical activity after the 2003 injury, and

Second, plaintiff thereby failed to use ordinary care, and

Third, plaintiff thereby sustained damage that would not have occurred otherwise.

As the language of the instruction plainly demonstrates, this instruction is to be used by the jury in calculating *damages*, not *percentages of fault*. Juries are "presumed to follow the instructions given by the trial court." *Lester v. Sayles*, 850 S.W.2d 858, 875 (Mo. banc 1993) (Covington, J., concurring in part and dissenting in part). *See also Barlow v. Thornhill*, 537 S.W.2d 412, 422 (Mo. banc 1976) ("In the absence of exceptional circumstances, it is to be assumed the jury obeyed the trial court's direction."); *Johnson v. State*, 406 S.W.3d 892, 904 (Mo. banc 2013) ("[T]he jury is presumed to follow the instructions of the court."). Not only does this instruction *not* provide for the jury assessing a percentage of fault based on any finding of failure to

---

plaintiff for plaintiff's failure to mitigate damages—unlike the present case where the jury was *not* so instructed). The MAI Committee also cites to *Tillman v. Supreme Express & Transfer, Inc.*, 920 S.W.2d 552 (Mo. App. E.D. 1996), where the court rejected the comparative fault approach to mitigation of damages. Given the inconsistent approaches, the MAI Committee stated in its Committee Comment:

> In order to avoid potential inconsistencies in alternative methods of submission (comparative fault approach in some cases, the FELA approach in other cases, and yet other possible approaches in other cases), the Committee has concluded that it is best to adopt a uniform approach to the submission of the doctrine of mitigation of damages *in all cases* as reflected in MAI 32.29 *and the revision of MAI 4.01*. This approach is both legally and logically correct and consistent with the approach already taken in FELA cases (See MAI 24.04(A) and MAI 24.07). It is also in compliance with the mandate of § 537.765 that failure to mitigate damages "shall diminish proportionately the amount awarded as compensatory damages . . . ."

(Emphasis added.) The "revision of MAI 4.01" referenced by the MAI Committee is the following phrase to be used "if failure to mitigate damages is submitted": "If you find that plaintiff failed to mitigate damages as submitted in Instruction No. ___, in determining plaintiff's total damages *you must not include those damages that would not have occurred without such failure*." (Emphasis added.) As we explain in our ruling today, counsel for YMCA made this argument to the jury in his closing. However, YMCA did not seek at any time to modify the damages instruction submitted to the jury (patterned after MAI 37.03) to include the mitigation of damages language identified in MAI 4.01, even though MAI 32.29 contemplates such revision.

9

mitigate, but YMCA's counsel, in its closing argument, correctly described to the jury how it could use the instruction in its deliberation. YMCA's counsel stated in closing:

> So I would submit to you, ladies and gentlemen, that we don't think that we're liable in this case, but if, in fact, you were to disagree with me, that you would take a look at Exhibit 1002. That's Mr. Rider's past medical expenses that are sorted by date. Okay? There's another one in there that's sorted by providers but this one is sorted by date.
>
> And you can flip through there and pick out a date, if you decided that the YMCA was liable, and just add up those expenses from that point backwards.
>
> There was an exhibit that was, or some writing about future expenses, 445 to 815. All of those occurred after three subsequent fractures that occurred that were not within the YMCA's care and were not foreseeable to the YMCA.

To suggest that the jury disregarded the plain language of the "mitigation of damages" instruction and, instead, used it to assess a percentage of fault is to ignore YMCA's own argument to the jury; but, more importantly, YMCA's argument ignores the law and the MAI and is, consequently, without merit.

YMCA further urges that, should this court agree that there was insufficient evidence to support the giving of its instruction for comparative fault for failure to keep a careful lookout, we should remand this matter for a new trial rather than reversal with a modified judgment. YMCA cites *Shaffer v. Federated Mutual Insurance Co.*, 903 S.W.2d 600 (Mo. App. S.D. 1995), and *Kenney v. Wal-Mart Stores, Inc.*, 100 S.W.3d 809 (Mo. banc 2003). Both cases are inapposite. In *Shaffer*, the plaintiff's verdict director was premised on recovery under either of multiple disjunctive theories; and since the appellate court determined that one of those theories of recovery was not supported by substantial evidence but the other may have been, the court reversed the award in favor of plaintiff and remanded for a new trial on the alternative theory. *Shaffer*, 903 S.W.2d at 607. In *Kenney*, where the court concluded that the verdict director failed to include a necessary element for recovery on the remedy elected by the plaintiff, the court

10

reversed the award in favor of plaintiff and remanded for a new trial for plaintiff to have the opportunity to prove the missing element that the trial court erred in failing to submit to the jury in its verdict director. *Kenney*, 100 S.W.3d at 818.

Here, conversely, YMCA's claim of comparative fault was not submitted in an alternatively pled disjunctive instruction; nor was any element of its elected comparative fault instruction omitted. Instead, there simply was no substantial evidence of failure to keep a careful lookout in the evidence of the case, and it does not appear from the record that any such evidence was available.

Rather, this case is procedurally identical to the holding in *Hayes v. Price*, 313 S.W.3d 645 (Mo. banc 2010). In that case, plaintiff and plaintiff's companion were each operating a motorcycle traveling southbound, and the defendant was operating a car northbound. The defendant stopped at an intersection intending to turn left. Defendant could see plaintiff's companion motorcyclist, but plaintiff was obscured by another vehicle in the left southbound lane waiting to turn left at the intersection. Defendant waited for the companion motorcyclist to pass, but then ultimately did proceed with her left turn and drove into the left side of plaintiff's motorcycle. Plaintiff filed suit and the case was tried to a jury. Plaintiff submitted his case on the theory that the defendant was negligent for failure to yield. Over plaintiff's objection, defendant submitted a comparative fault instruction based on plaintiff's failure to keep a careful lookout. The jury returned a verdict in favor of plaintiff in the amount of $625,000.00. It apportioned 20% of the fault to plaintiff and 80% to defendant, and therefore the trial court reduced plaintiff's damage award by $125,000.00.

On appeal, the Missouri Supreme Court found that there was no "substantial evidence to support the submission of [plaintiff's] comparative fault because there was no evidence that a

11

reasonable driver could or should have seen any indication of a danger at a time that would allow him to have the means and ability to use an evasive action to avoid the collision." *Id.* at 652. Since "the failure to keep a careful lookout instruction was not supported by substantial evidence, the instruction was improperly submitted to the jury," and it was "prejudicial because [plaintiff] was assessed a percentage of comparative fault for the accident as a result of the erroneous instruction, and his damages were reduced by that percentage." *Id.* Accordingly, the Missouri Supreme Court reversed the trial court's judgment assessing 20% of the fault to plaintiff. *Id.* at 656. The *Hayes* court noted that Rule 84.14 permits an appellate court to modify the judgment by eliminating a reduction in damages because of erroneous assessment of comparative fault and entered judgment "to reflect that [defendant] is 100 percent at fault and that [plaintiff's] damage award is $625,000.00, the full amount assessed by the jury." *Id.*

As noted above, the instant appeal is procedurally identical to the scenario in *Hayes*. Here, there was no "substantial evidence to support the submission of [Rider's] comparative fault because there was no evidence that a reasonable [person of Rider's age, capacity, and experience] could or should have seen any indication of [water on the tile floor posing] danger at a time that would allow him to have the means and ability to use evasive action to avoid the [accident]." *Id.* at 652. "Because the failure to keep a careful lookout instruction was not supported by substantial evidence, the instruction was improperly submitted to the jury," and it was "prejudicial because [Rider] was assessed a percentage of comparative fault for the accident as a result of the erroneous instruction, and his damages were reduced by that percentage." *Id.* Accordingly, Rider's point on appeal is granted and "[j]udgment is entered to reflect that [YMCA] is 100 percent at fault and that [Rider's] damage award is [$5,906,525.00], the full amount assessed by the jury." *Id.* at 656.

12

*YMCA's Cross-Appeal*

***Application of Missouri Law:***

The first of YMCA's four points on cross-appeal is that the trial court erred in refusing to apply Kansas law on comparative fault (barring a recovery of damages by a plaintiff who is found to be more at fault than the defendant) and in refusing to apply Kansas's cap on non-economic damages. Because we have determined that there was no substantial evidence to support the submission of the comparative fault instruction to the jury (and consequently, no basis for a finding of any percentage of fault to Rider), the "in excess of 50% comparative fault" part of YMCA's argument is rendered moot. We thus proceed to review the trial court's refusal to apply the Kansas cap on non-economic damages.

"The question of which State's law to apply is . . . a question of law, subject to de novo review." *Wilson v. Image Flooring, LLC*, 400 S.W.3d 386, 391 (Mo. App. W.D. 2013). When a conflict of law exists, Missouri evaluates which law should govern according to the Restatement (Second) of Conflicts of Laws. *Hicks v. Graves Truck Lines, Inc.*, 707 S.W.2d 439, 444 (Mo. App. W.D. 1986). While the state where the tort occurs has a significant interest regarding the *right of remedy*, "the same cannot be said when the issue is the *right of recovery*." *Wilson*, 400 S.W.3d at 397-98 (emphasis added). We find the procedural background and choice of law discussion in *Wilson* persuasive to our ruling today.

In *Wilson*, this court ruled that Kansas's statutory damage cap should not apply, even though the accident giving rise to the injury occurred in Kansas, where all of the parties to the lawsuit were domiciled in Missouri or were Missouri corporations. *Wilson*, 400 S.W.3d at 398. Specifically, we noted that when the issue is the right of recovery, "the domicile of the parties becomes a highly significant contact, as states have a great interest in applying their own

13

compensation-related laws to their own residents, but very little interest in applying those same laws to non-residents." *Id.* After acknowledging that both Missouri and Kansas would have some interest in applying their compensation laws to those doing business within their respective states, we concluded that where "the conflict involves a rule of recovery or question of compensation, the domicile of the parties is the most significant contact." *Id.* The case before us is not distinguishable in any meaningful respect. Rider is a Missouri resident, and YMCA is a Missouri not-for-profit corporation with its principal place of business in Missouri. Accordingly, Missouri's law with respect to right of recovery as between two Missouri residents was properly applied by the trial court.

YMCA's first point is denied.

### *Evidence of Breach of Duty:*

YMCA's second point on appeal is that the trial court erred in denying its motion for directed verdict because there was not substantial evidence that YMCA breached a duty that it owed to Rider in that there was no evidence of water on the floor causing Rider to fall. To establish that the trial court erred in denying its motion for directed verdict, YMCA must show that Rider failed to make a submissible case. *Altenhofen v. Fabricor, Inc.*, 81 S.W.3d 578, 584 (Mo. App. W.D. 2002). Upon review, we view the evidence in the light most favorable to the non-moving party (Rider), accepting all reasonable inferences favorable to the verdict and disregarding contrary evidence. *Id.* In support of its claim, YMCA argues that no one, including Rider himself, saw any water on the smooth tile floor. YMCA misses the point; for while the latency of this dangerous condition is relevant to a "careful lookout" discussion examining whether the wet condition of the floor was "plainly visible," it was *not* relevant to the jury's consideration of fault to be assessed to YMCA. Instead, Instruction No. 7 stated:

14

In your verdict, you must assess a percentage of fault to defendant whether or not plaintiff was partly at fault if you believe:

First, either:

defendant failed to prevent the cafeteria floor from becoming slippery, or

defendant failed to have adequate policies and procedures in place to prevent the cafeteria floor from becoming slippery, and

Second, defendant, in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to plaintiff.

Thus, the question here is not whether the wet condition was "plainly visible," but rather, was there evidence that the floor had become wet and slippery, directly causing damage to Rider. Clearly, there was. YMCA had directed the children to play outside on a playground containing melting snow and ice; the children were then shepherded inside onto a smooth tile floor but were not provided with any type of mat on which to wipe their feet; the children were then directed to a large communal sink to wash their hands, several children at a time, and again no floor mat was provided; Rider was the last child to cross the floor, and although his clothing was dry before his fall, it was wet after he fell; finally, upon Mother's arrival at the scene, she was advised by YMCA staff that her son had "fallen and slipped in water." All of this evidence, viewed in the light most favorable to the jury's finding of liability by YMCA, is sufficient to support its finding that there was water on the floor causing the floor to become slippery, which led to Rider's slip and fall.

YMCA's second point is denied.

*Negligence versus Premises Liability:*

YMCA's third point relied on is that the trial court erred in permitting Rider to elect his remedy—to submit his case on a negligence theory only instead of a theory of premises liability. We review *de novo* the trial court's ruling with regard to the form of a verdict director and theory of liability a plaintiff may submit. *Gumpanberger v. Jakob*, 241 S.W.3d 843, 846 (Mo. App. E.D. 2007). We review the evidence "in a light most favorable to the submission of the instruction on any theory supported by the evidence." *Nagaragadde v. Pandurangi*, 216 S.W.3d 241, 244 (Mo. App. W.D. 2007). "Even in a situation where the evidence could support two theories of recovery to which two separate MAI instructions would be applicable, the plaintiff has the right to elect the theory on which to submit [his] case and to select the appropriate MAI verdict director." *Id.* at 245.

*Nagaragadde*, like this case, involved a discussion of whether the cause of the injury was an affirmative act of negligence or whether it was a mere passive condition of the property, which might more appropriately warrant a premises liability instruction. *Id.* at 245. In other words, the appellant was making the exact same argument under Missouri law as YMCA makes here, while arguing that Kansas law should apply. The court in *Nagaragadde* determined that an affirmative act by the appellant caused the dangerous condition and, therefore, that simple negligence was a proper instruction. *Id.* at 245-46.[8] Similarly in the present case, the dangerous

---

[8] In *Nagaragadde*, the defendant/appellant, a practicing Hindu, had set up a prayer area that included an altar and a small oil lamp placed on the floor. On the date of the incident, the defendant/appellant had lit the oil lamp and completed his prayer session but neglected to extinguish the flame from the lamp. The *Nagaragadde* court concluded that "the foreseeability of injury from failing to extinguish the lamp was apparent," and "it was not necessary to add the additional qualifying factor that he knew or should have known of the potential harm to [his house guest]." *Nagaragadde v. Pandurangi*, 216 S.W.3d 241, 247 (Mo. App. W.D. 2007). Under such circumstances, the *Nagaragadde* court concluded that "the evidence at trial established an affirmative act of negligence that was unrelated to the passive condition of the home in which it occurred," *id.* at 245, and also concluded that the following verdict directing instruction—on the record before the court—was not given in error:

Your verdict must be for plaintiff if you believe:

16

condition was not alleged to have been a passive condition inherent to the premises but was, instead, a condition immediately caused by the actions of YMCA staff directing the children to play outside in wet conditions, to wash their hands at a large communal sink, and then to cross a smooth tile floor—all without providing any type of mat on which the children could wipe their feet and without otherwise preventing the dangerous condition from arising. YMCA concedes that affirmative acts causing a hazard are appropriate for negligence actions, even under Kansas law, but argues that no affirmative negligence occurred here. To the extent that the YMCA believed the negligence verdict directing instruction (Instruction No. 7) failed to properly set forth the Kansas distinction between active and passive negligence, it should have provided a negligence verdict directing instruction for the trial court (and this court) to consider. *See Mackey v. Smith*, 438 S.W.3d 465, 477 (Mo. App. W.D. 2014). Not only did YMCA fail to do this, but it affirmatively conceded on the record at the instruction conference that the elements of negligence in Kansas did not differ materially from those in Missouri. The instruction given was an MAI instruction, which should be used as long as it correctly states the applicable substantive

---

First, that defendant failed to extinguish an open flame on a ceremonial oil lamp at the conclusion of his use of the lamp;

Second, that defendant was thereby negligent, and

Third, that as a direct result of such negligence, plaintiff sustained damage.

When viewed in a light most favorable to the verdict, the evidence presented at trial regarding the affirmative acts of the YMCA staff, the dangerously wet condition of the property, and the verdict directing instruction are not appreciably different than the evidence and verdict director in *Nagaragadde*. While our ruling today should not be taken as an endorsement of a general negligence verdict directing instruction against an owner or occupier of land that does not include express reference to affirmatively negligent acts of the defendant (as opposed to the more passive description of "failing to take some action"), we note that in neither *Nagaragadde* nor the present case did the defendant seek to tender an alternative verdict directing instruction to compel the submission of such acts as a precondition to liability under a general negligence theory. Instead, in each case, the defendant took an "all or nothing" approach to the general negligence verdict directing instruction, leaving this court with no alternative general negligence verdict directing instructional language against which error could be considered by this court. As we state in our ruling today, it is the responsibility of the party complaining of the language of a verdict directing instruction to tender a substitute instruction to the trial court if it seeks consideration of such error by an appellate court. *See Mackey v. Smith*, 438 S.W.3d 465, 477 (Mo. App. W.D. 2014).

17

law. *Livingston v. Baxter Health Care Corp.*, 313 S.W.3d 717, 728 (Mo. App. W.D. 2010). We therefore find no error in the trial court's submission of the negligence verdict director as to YMCA's negligence, Instruction No. 7.

YMCA's third point is denied.

***Mistrial Based Upon Insurance References:***

YMCA's final point on appeal is that the trial court erred in refusing to grant a mistrial based upon references to insurance during trial. We review the denial of a motion for mistrial for abuse of the trial court's discretion. *Arrington v. Goodrich Quality Theaters, Inc.*, 266 S.W.3d 856, 860 (Mo. App. S.D. 2008). More specifically as to claims of reversible error for a trial court's refusal to grant a mistrial upon references to insurance in the presence of the jury, we have previously concluded:

> Aside from the rules regarding the asking of the "insurance question,"[9] it generally is improper to inject the issue of liability insurance into an action for damages, and such an injection of insurance can constitute reversible error, particularly if done . . . in bad faith. However, not every reference to insurance constitutes reversible error or requires the discharge of a jury. The trial judge is in a much better position than the appellate court to determine whether a reference to insurance was motivated by good or bad faith. The trial court also is better able to judge the effect on the jury. For these reasons, the decision of whether to grant a mistrial when such a situation arises is one that is left to the sound discretion of the trial court, and only where a manifest abuse of discretion occurs will the appellate court disturb this decision.

*Taylor v. Republic Automotive Parts, Inc.*, 950 S.W.2d 318, 321 (Mo. App. W.D. 1997) (citations omitted).

Thus, while we are cognizant that parties are not entitled to intentionally "flaunt insurance coverage in the jury's face," *Pope v. Pope*, 179 S.W.3d 442, 464 (Mo. App. W.D.

---

[9] *See Saint Louis Univ. v. Geary*, 321 S.W.3d 282, 292 (Mo. banc 2009) (citing *Ivy v. Hawk*, 878 S.W.2d 442, 445 (Mo. banc 1994)), for a description of Missouri's rule for asking the preliminary "insurance question." That said, we note that follow-up questions to the preliminary "insurance question" are permissible at the discretion of the trial court. *Ivy*, 878 S.W.2d at 446.

2005) (internal quotation omitted), we are also mindful that trial courts are in the best position to observe a party's motivation in doing so and, likewise, are in the best position to determine whether a party's conduct has "incited prejudice in the jury." *Arrington*, 266 S.W.3d at 860 (internal quotation omitted).

Here, during voir dire, Rider's counsel sought and received permission to ask the preliminary "insurance question." Rider's counsel also sought information from the venire panel about those possessing medical, legal, and investigative experience or knowledge. Without objection to questioning, Venireperson 49 identified himself as a licensed agent for an insurance company in the area of property and casualty. It was only after Rider's counsel attempted to follow up with a "How long have you . . ." question to this venireperson that YMCA's counsel objected and sought a mistrial. The trial court sustained the objection, directed Rider's counsel to cease any such further line of questioning, and denied the request for mistrial. Rider's counsel complied with this directive, and voir dire was completed without further incident.

Later, YMCA's witness, Phillips, was adamant that she did not remember ever giving a recorded statement about Rider's fall to a Mr. Minter. Mr. Minter was a liability claims adjuster for YMCA's insurance company and had taken a recorded statement from Phillips after the incident, and the recorded statement contradicted her trial testimony. Mr. Minter's videotaped deposition was played for the jury after it had been edited and any reference to "insurance" or "adjuster" had been removed from the video, such that Mr. Minter was described as an "investigator." Even though Phillips had been provided a summary of her recorded statement at her deposition, she still denied any memory of talking with Mr. Minter. Thus, in response, Rider's counsel proceeded to question Phillips about the summary prepared by the "investigator" but twice inadvertently referred to Minter as a "claims adjuster." On each occasion, Rider's

19

counsel immediately withdrew the question, and ultimately, the trial court concluded that it was inadvertent, was unintentional, and was not a direct reference to insurance, and the trial court refused to order a mistrial as requested by YMCA.

Still later, YMCA's corporate representative, Mark Hulet, volunteered that "I'm assuming the investigator from the insurance companies . . . [compiled the tape-recorded statements of witnesses]." The question posed did not mention insurance, nor did it require a response mentioning insurance; yet YMCA's corporate representative interjected it into his response. Notably, Rider's counsel did not follow up with further questions highlighting "insurance," even though Mr. Hulet had brought it up. YMCA's corporate representative was not the only YMCA representative to mention insurance in the case; during cross-examination of Rider's life care plan expert witness, YMCA's counsel questioned the expert witness about the Affordable Health Care Act.

At the conclusion of evidence and in an abundance of caution, the trial court exercised its discretion to include Instruction No. 5, patterned after MAI 2.07, in the general instruction packet to the jury, to-wit:

> The existence or non-existence of any type of insurance, benefit, right or obligation of repayment, public or private, must not be considered or discussed by any of you in arriving at your verdict. Such matters are not relevant to any of the issues you must decide in this case.

In explaining the rationale for choosing to submit this instruction to the jury, the trial court reasoned that he was exercising his discretion to do so—that the trial court did *not* feel compelled to do so as a result of any "inadvertent statements made by counsel." Rather, the trial court explained that its decision was based upon "the totality of the entire case, the evidence presented, to which there was either no objection or to which an objection was overruled."

Neither party to this appeal has complained on appeal that the trial court erred in submitting Instruction No. 5, patterned after MAI 2.07.

"[W]e presume that the jury follows the court's instructions." *Brown v. Bailey*, 210 S.W.3d 397, 412 (Mo. App. E.D. 2006). "A jury is presumed to be aware of and have followed the instructions given by the trial court." *State v. Hashman*, 197 S.W.3d 119, 134 (Mo. App. W.D. 2006).

Under the circumstances of this case, we find no manifest abuse of discretion by the trial court in refusing to grant a mistrial.

YMCA's fourth point on appeal is denied.

## Conclusion

Because the trial court erred in submitting the jury instruction for comparative fault for failure to keep a careful lookout, and because that error was prejudicial to Rider, we reverse the judgment of the trial court assessing a percentage of fault to Rider. As noted, *supra*, "Rule 84.14 authorizes an appellate court to modify the judgment by eliminating the reduction in damages due to erroneous assessment of comparative fault to [Rider]." *Hayes*, 313 S.W.3d at 656. Judgment is entered to reflect that YMCA is 100% at fault and that Rider's damages award is $5,906,525.00, the full amount assessed by the jury. *See id.* In all other respects, the judgment is affirmed.

_____
Mark D. Pfeiffer, Judge

Joseph M. Ellis, Presiding Judge, and
Victor C. Howard, Judge, concur.